**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Thomas R. BRIMBERRY, Defendant-Appellant.**

**No. 85–2000.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1986.
Decided Oct. 16, 1986.

W. Rodney DeVilliers, Sr., Oklahoma City, Okl., for defendant-appellant.

Clifford J. Proud, U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before WOOD, EASTERBROOK, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This case comes to us after a remand hearing mandated by this court's decision in *United States v. Brimberry,* 744 F.2d 580 (7th Cir.1984). This court remanded for a hearing to determine whether the government had obtained the testimony of its main witnesses in the defendant's trial for obstruction of justice independently of the defendant's immunized testimony. The district court determined that the witnesses, Jerry Maeras and Arthur Miller, testified because of the case the government had developed against them independently of the defendant. The district court also determined that the defendant breached his plea agreement on several occasions and that therefore the government was free to charge the defendant with obstruction of justice or with any of the crimes covered by the immunity agreement. The district court also denied the defendant's motion to dismiss or for a new trial. The defendant appeals the district court's decision on remand and the denial of the motion to dis-

miss or for a new trial. We affirm both decisions.

## I. FACTS

In the defendant's original appeal, this court described the case as follows:

In February 1981, the Criminal Investigation Division of the Internal Revenue Service (IRS) began an investigation of the defendant and his wife for possible tax evasion during the years 1977 through 1980. During this period, the defendant was employed by Stix & Company, a St. Louis brokerage firm. Both this IRS investigation and a federal grand jury investigation, which began in the Southern District of Illinois in July 1981, revealed the identity of a number of individuals who were involved in the defendant's financial activities. These individuals, as well as the defendant and his wife, were interviewed by IRS agents on October 21, 1981, and the agents served several subpoenas for Stix business records.

On November 2, 1981, the defendant and the government entered into a plea agreement that allowed the defendant to plead guilty to a single tax felony count in exchange for his cooperation in the investigation of Stix affairs. Thereafter, the defendant informed the government agents of an intricate financial scheme through which millions of dollars had been diverted from Stix. The defendant also led the agents to Stix records that he said were in danger of being destroyed by a business associate. In addition, the defendant testified about the Stix fraud before representatives of the Securities and Exchange Commission (SEC) and before a grand jury in the Eastern District of Missouri.

The Missouri grand jury returned indictments against five of the other participants in the Stix fraud, including Jerry Maeras and Arthur Miller Jr. After entering into plea agreements with the government in the fall of 1982, Maeras and Miller explained the details of the Stix fraud scheme. They also revealed that, during the government investigation, the defendant had told them to destroy Stix records. On the basis of this information, the defendant was indicted for obstruction of justice.

At the defendant's trial, Miller testified that on October 21, 1981, after he was visited by IRS agents, the defendant told him to burn all his records so that the IRS would have a hard time "trying to put everything together." ... Miller said that he followed the defendant's instruction. Miller also testified that, during the second week in November 1981, the defendant called Miller and asked him if he had burned his records. When Miller replied that he had, the defendant told Miller to make sure that Maeras had done the same. A family friend of Miller, Sherry Lisson, testified that the defendant called her in April 1982 and asked her to go into Miller's house to retrieve any records involving Stix. Lisson recounted that the defendant called again a short time after this conversation and asked if she had found any records in Miller's house. Although Lisson had not looked for the records, she told the defendant that she had not found any.

Maeras took the stand at the defendant's trial and stated that, during the second week in November 1981, the defendant called and told him to burn his Stix records. A few minutes after this call, the defendant called Maeras again and said that if Maeras did not burn his records, "there would be a blood trail." ... Maeras did not destroy his records.

The government also presented evidence at trial regarding the disbursement of proceeds from the Stix fraud. Government agent John Brissman testified, with the aid of a prepared chart, that 2.8 million dollars of the proceeds could not be accounted for. Through this testimony, the government sought to establish a motive for the defendant's alleged attempts to obstruct justice.

The jury returned a verdict of guilty on two counts of obstructing justice.

*United States v. Brimberry,* 744 F.2d 580, 582–83 (7th Cir.1984) (footnote omitted). The jury acquitted Brimberry on a third count of obstructing justice.

The defendant appealed the conviction, and this court remanded for an evidentiary hearing "at which the government must prove that Miller and Maeras would have testified against the defendant because of the case the government had developed against them entirely apart from the defendant's information." *Id.* at 587. If the government failed to prove this, then "the trial court must assess the government's two-prong contention that the defendant breached the plea agreement and that such a breach allowed the government to prosecute the defendant for obstruction of justice." *Id.* at 588.

After the case was remanded, the defendant discovered that the FBI had interviewed an attorney in southern Illinois. The FBI report of the interview indicated that the attorney had made statements which might have contradicted Jerry Maeras's testimony that Brimberry told him to burn his records. Consequently, Brimberry moved in the alternative to dismiss or for a new trial based on the prosecution's withholding of exculpatory evidence.

The district court held a hearing on the remand issue and also on the defendant's motion. After this hearing the court found, under *United States v. Xheka,* 704 F.2d 974 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983), that there was no "reasonable likelihood that the government's failure to furnish the 302 Report [of the interview of the attorney] would have changed the result in this case." The court therefore denied the motion to dismiss or for a new trial. In connection with the remand issue, the district court made a number of findings of fact. The court concluded that the government had built strong cases against both Maeras and Miller independently of Brimberry and that Maeras and Miller were not motivated to cooperate by information from Brimberry. The court further determined that the defendant had breached the plea agreement by lying to the grand jury investigating the Stix fraud and by instructing Maeras and Miller to burn their records. The court decided that Brimberry's breach abrogated the grant of immunity and opened him up to perjury charges, obstruction of justice charges, and any charges stemming from the Stix fraud.

Brimberry appeals these determinations. He argues that the prosecution's intentional suppression of the FBI report requires at least a new trial. The defendant also asserts that the district court erred in finding that Maeras and Miller testified independently of his cooperation where there was no evidence that Maeras and Miller either knew or were advised of the government's case against them. The defendant also argues that the district court should have followed the approach of the Second Circuit in *United States v. Kurzer,* 534 F.2d 511 (2d Cir.1976), and held that a perjury prosecution, not abrogation of the immunity agreement, is the appropriate remedy for breaching the agreement by lying to a grand jury.

## II. DISCUSSION

### A. Brady *Disclosure*

The defendant argues that the prosecution's failure to furnish defense counsel with an FBI report of an interview with a potential witness denied him due process and a fair trial. The defendant contends that the prosecution withheld this report despite a specific request.

The FBI report stated that the FBI agent who wrote the report, along with Special Agent James Wehrheim of the IRS, had interviewed an attorney named Nick Vasileff who had known Jerry Maeras all his life. The report further stated that Vasileff had told them that shortly before the Stix fraud became public knowledge Maeras came to Vasileff with a number of cashier's checks. Vasileff told the agents that he looked at Maeras's records and suggested some attorneys who could represent him.

The report continues:

Vasileff advised that he again met with Jerry Maeras at his office after the Stix and Company investigation had become public knowledge. He advised that during this meeting Maeras received a telephone call and after the phone call, Maeras told Vasileff that he had to leave that Thomas Brimberry had called him at the gas station and that he was going to call back in ten minutes. Vasileff advised that he accompanied Jerry S. Maeras back over to the gas station, which is right across the street from his office. Vasileff advised that at the time he reached the gas station, that he believes that Sally Maeras, Steve Wilson, and Don (Last Name Unknown) (LNU), who is an employee at the Golden Shell Station, were all present when Maeras got to the station.

Vasileff advised that he did not actually go in the gas station, however, he did see Jerry S. Maeras talking on the telephone with someone. He advised that he is not sure whether Steve Wilson or Don (LNU) overheard any of Maeras' conversation with the party on the telephone. He further advised he is not sure whether Sally Maeras overheard any of Jerry Maeras' conversation either.

He advised that when Maeras completed his telephone conversation, he came out and said that Tom Brimberry had been on the phone and that Brimberry had made the statement to Maeras to "tell it like it was", or words to that effect. Maeras further advised Vasileff that Brimberry had stated that it was not necessary that Maeras make any statements to any investigators regarding any aspect of the Stix and Company investigation.

Vasileff advised that after Maeras completed his conversation with Brimberry, that Maeras came out of the gas station and advised that Maeras was going to the Busy Bee Bakery to get another call from Thomas Brimberry. Vasileff advised that he has never had any discussions with Maeras regarding whether Maeras received a subsequent call from Brimberry at the Busy Bee Bakery or not.

The government contends that it did not have the attorney's affidavit before trial, and that the FBI report of the interview differs significantly from the attorney's affidavit.[1] The government further asserts that the defendant made only a general request for exculpatory or impeaching evidence. The government also denies that the FBI report was intentionally withheld. The Special Assistant United States Attorney who tried the case testified at the hearing on the defendant's motion that the failure to produce the report was inadvertent as the government was not going to call the attorney as a witness and, in his opinion, the attorney's testimony would not add anything to the case. Finally, the government, citing *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *United States v. Mackey,* 571 F.2d 376 (7th Cir.1978), argues that the report and Vasileff's testimony would have been merely impeachment evidence and that the failure to disclose this material did not deny the defendant a fair trial.

The district court viewed the defendant's request for information as "a general 'Brady' motion for disclosure of evidence favorable to defendant including exculpatory or impeaching evidence." The court, relying on *United States v. Xheka,* 704 F.2d 974

---

**1.** The government did not have Vasileff's affidavit before trial. An FBI agent interviewed Vasileff and wrote the report of that interview in February 1983. In October 1984 Brimberry's counsel learned that Vasileff, an attorney who had previously represented Jerry Maeras, had information which contradicted Maeras's trial testimony. Brimberry's counsel interviewed Vasileff in November 1984. Vasileff's affidavit from that interview formed the basis of Brimberry's motion to dismiss or for a new trial. In evaluating the failure to disclose the FBI report to defense counsel, it is important to note that the government did not have Vasileff's affidavit before trial, and that the information in the FBI report of Vasileff's interview differs from that in Vasileff's affidavit. For the purposes of evaluating the denial of the defendant's motion, we will focus on the information contained in the FBI report as that is the document the government had in its possession.

(7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983), and having heard all the evidence, concluded that there was no reasonable likelihood that the FBI report would have changed the result as the report would have been merely "a foundation for an attempt to impeach Maeras."

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196. In order to succeed on his *Brady* claim, Brimberry must show that the prosecution suppressed material evidence that was favorable to the defendant. *United States v. Jackson,* 780 F.2d 1305, 1308 (7th Cir.1986). As it is undisputed that favorable evidence was suppressed, the only issue is whether the FBI report withheld from the defense was material evidence.

■ The defendant first contends that the prosecution "consciously and intentionally" ignored the defendant's specific *Brady* request. The defendant, citing *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *United States v. Librach,* 520 F.2d 550 (8th Cir.1975), *appeal after remand,* 536 F.2d 1228 (8th Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976), asserts that intentional suppression of favorable evidence entitles a defendant to a new trial if there is any reasonable likelihood that the evidence could have affected the jury's ver-

dict.[2] In *Giglio,* the Supreme Court was faced with the "deliberate deception of a court and jurors by the presentation of known false evidence," *id.* 405 U.S. at 153, 92 S.Ct. at 766. In this case, however, the defendant does not assert, nor does the record indicate, that the prosecution deliberately used perjured testimony. The defendant contends that the Vasileff affidavit directly refutes Maeras's testimony and indirectly refutes Miller's corroboration. But the fact that the FBI report and Vasileff's affidavit may have varied from the other evidence does not establish that either Maeras or Miller lied at trial, or that the government knew or should have known that the testimony was false. *See United States v. Santiago,* 798 F.2d 246, 247 (7th Cir.1986).

■ The Supreme Court has stated that "the constitutional obligation [to disclose favorable evidence] is [not] measured by the moral culpability, or the willfulness, of the prosecutor.... If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Agurs,* 427 U.S. at 110, 96 S.Ct. at 2401 (footnote omitted). This court has noted, however, that bad faith is an appropriate factor to consider where the materiality of the evidence has not been conclusively determined. *Jackson,* 780 F.2d at 1311 n. 4.

■ In this case, the defendant has not established that the prosecution intentionally suppressed the FBI report. The defendant points to an excerpt from the testimony

---

2. Brimberry also argues that where the prosecution intentionally suppresses evidence the standard of review is the amount of prejudice to the defendant's trial preparation, not the effect on the jury's verdict. *United States v. Polisi,* 416 F.2d 573, 577 (2d Cir.1969); *United States v. Kahn,* 472 F.2d 272, 287 (2d Cir.), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). As the *Kahn* court explained:

If it can be shown that the government deliberately suppressed the evidence ... [or] if it appears that the high value of the undisclosed evidence could not have escaped the prosecutor's attention ... the materiality of the evidence to the defendant is measured by the

effect of its suppression upon preparation for trial, rather than its predicted effect on the jury's verdict.

472 F.2d at 287. In this case, as the defendant has not established that the government intentionally suppressed the evidence, and as the FBI report was ambiguous and not clearly of such high value to the defense that the prosecution could not have overlooked it, the defendant has the higher burden of showing that the introduction of the FBI report would have created a reasonable doubt and would have prevented the jury from convicting the defendant. *Id.* Brimberry has failed to establish this, and the denial of the defendant's motion was therefore proper.

of Special Assistant United States Attorney Kane at the hearing on the defendant's motion[3] as evidence of blatant intentional suppression. Kane testified, however, that he had "no conscious recollection of any conscious decision to turn [the report] over or not turn it over." This does not indicate an intent to suppress this evidence.

The defendant next argues that he made a specific request for *Brady* material and that this distinguishes this case from the cases relied on by the government, *United States v. Mackey*, 571 F.2d 376 (7th Cir. 1978), and *United States v. Xheka*, 704 F.2d 974 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court considered the materiality standard in three different situations: (1) knowing use of perjured testimony; (2) pretrial request for specific evidence; and (3) a general request or no request. The court enunciated different standards for each category. *Id.* at 103, 104, 107, 112, 96 S.Ct. at 2397, 2398, 2399, 2401.

In *United States v. Bagley*, — U.S. —, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), however, the Court adopted the "reasonable probability" standard for the latter two categories. A majority of the Court agreed with Justice Blackmun's formulation that in "the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused[,] [t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding

would have been different." *Id.*, 105 S.Ct. at 3384. *See Jackson*, 780 F.2d at 1309–10; *United States v. Driver*, 798 F.2d 248, 250 (7th Cir.1986); *United States v. Kehm*, 799 F.2d 354, 358 (7th Cir.1986). The Court went on to state that a " 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 105 S.Ct. at 3384.

As the *Bagley* Court has adopted the same standard for both specific and general requests, we need not decide whether Brimberry made a specific request which covered the FBI report. *See Jackson*, 780 F.2d at 1310. We turn now to decide whether it is reasonably probable that the result of the trial would have been different if the FBI report had been given to the defense.

Brimberry contends that the attorney's testimony would have directly contradicted Jerry Maeras's testimony, and would have impeached Arthur Miller also as he corroborated Maeras's version of events. The defendant asserts that this exculpatory and impeachment evidence would not have been cumulative. *See Mackey*, 571 F.2d at 389 ("the omitted evidence was merely additional material for impeaching an already thoroughly impeached witness").

The government contends that the information in the FBI report would not have changed the outcome of the trial as one of the statements in the report was equivocal, as other witnesses at trial corroborated different aspects of Maeras's testimony and would have contradicted the statements in the report, and as any impeach-

---

**3.** The relevant portion of the testimony is as follows:

Q. Did you make the decision not to make that memorandum available to the defense counsel?
A. I have no conscious recollection of any kind of conscious decision to turn it over or not to turn it over. In going over my recollection of this matter, I do recall discussing the interview of Mr. Vasileff with Agent Gulley and determining that on the basis of contradictory statements that Mr. Vasileff gave, his interview was of little use to our investigation.
Q. Did you likewise conclude it would be of little use to the defense counsel?

A. I made no conscious conclusion about that one way or the other.
Q. Did the fact that the only quote in the 302 was the words tell it like is [sic] was attributed by Mr. Maeras to Mr. Brimberry, did that strike you as being important?
A. That had no significance to me because as I said, I don't recall specifically reading that 302 interview, though I am sure I did, but as I look at it now, the quotes have no significance to me.
Q. Still doesn't?
A. That's correct.

ment of Maeras would have been cumulative as Maeras had been effectively impeached as a thief, a liar, and a coconspirator in the Stix fraud. The government also contends that the statements in the FBI report would have been inconsistent with Brimberry's defense theory that he could not have called Maeras because he was with the FBI at the critical times.

The statement in the FBI report that Maeras told Vasileff that Brimberry told him (Maeras) to "tell it like it was" would have contradicted Maeras's testimony that Brimberry told him to burn his records. The next statement, however, that Brimberry told Maeras that he need not talk to investigators about the Stix fraud, would not have helped the defense. Moreover, the testimony of several other witnesses would have contradicted the FBI report information. Sally Maeras, Jerry Maeras's wife, testified at the motion hearing that when Maeras received a message at Vasileff's office to go to the gas station, she and Vasileff followed after about 10–15 minutes. When they arrived, Maeras was on the phone. Maeras ran out of the gas station and down the street, and after he returned everyone left. She testified she was with Vasileff the whole time, and that she never saw Maeras speak with him.

In addition, two employees of the gas station, Don Alfano and Steve Wilson, testified at Brimberry's trial about the phone call. Wilson testified that Brimberry called looking for Maeras and stated that he would call back. Wilson located Maeras, and after Maeras arrived he received a phone call. During the call, Wilson overheard Maeras say that he had nothing to hide and he kept all his records. Wilson also testified that Maeras asked Don Alfano to look up the phone number at the Busy Bee Bakery. Wilson stated that Maeras left the station when he finished the conversation, just as Arthur Miller was arriving. Don Alfano testified that Maeras had asked him to look up the phone number of the Busy Bee Bakery. Alfano stated that he overheard Maeras say that he did not have anything to hide. Alfano also said that Maeras left the gas station head-

ing for the bakery about the same time Miller drove in.

■ Considering all of the evidence, disclosure of the FBI report would not have changed the outcome of the trial. Even if Vasileff had testified to his statements in the affidavit, as opposed to the contents of the FBI report, there is not a reasonable probability that this witness's testimony would have changed the outcome. There was sufficient corroboration of Maeras's testimony, and Maeras was sufficiently impeached by other information, that Vasileff's evidence in all probability would not have changed the jury's verdict. The defendant's motion for dismissal or for a new trial therefore was properly denied.

## B. Independent Testimony

■ Brimberry also appeals the district court's determination that Maeras's and Miller's testimony was obtained independently of Brimberry's cooperation. Brimberry argues that the district court erred in its determination because *"not one scintilla of proof* or evidence was introduced to show that either Maeras or Miller *were aware* of or had been advised of any case which the Government had built against them."

In the previous appeal, this court decided that although Brimberry had waived the issue by not arguing it at trial, "the trial court committed plain error in failing to require, *sua sponte*, that the prosecutors show that the obstruction prosecution did not result, directly or indirectly, from the defendant's cooperation with the government." *Brimberry*, 744 F.2d at 587. The court further decided that an evidentiary hearing was necessary to enable the government to make a "strict showing" that they obtained Maeras's and Miller's testimony independently of Brimberry's cooperation. The court remanded "with instructions to the trial court to hold a hearing at which the government must prove that Miller and Maeras would have testified against the defendant because of the case the government had developed against

them entirely apart from the defendant's information." *Id.*

The district court held such a hearing and made a number of findings of fact. The court found that the government had developed strong cases against Maeras and Miller long before Brimberry began cooperating with the government. The court found that the government established that Maeras and Miller had testified because of the government's case against them independent of Brimberry's information. The court also found that Brimberry had breached the immunity agreement by his actions after November 2, 1981.

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a). *See Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1439–40 (7th Cir.1986). "Findings of fact are 'clearly erroneous' only when the reviewing court 'is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Jabara,* 644 F.2d 574, 577 (6th Cir.1981) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

The district court's findings of fact in this case are not clearly erroneous. By the time the government made an agreement with Brimberry in November 1981, the IRS had compiled a significant amount of information about Maeras and Miller. The IRS had determined that Brimberry, Maeras, and Miller each owned one-third of Miller Excavating Company. Between 1976 and 1980 over three million dollars were deposited into the bank account of Miller Excavating. However, Miller Excavating did not file corporate tax returns after 1977. The government had also determined that Brimberry had taken substantial sums of money, not reported on his income tax returns, to Las Vegas, and that Maeras and Miller often accompanied him on these trips.

The IRS had also obtained Maeras's and Miller's income tax returns for 1976–80. These returns showed each having modest net incomes which were insufficient to support their lifestyles and business investments. The IRS had also determined that Maeras Enterprises had not filed any corporate income tax returns for 1977–81. On October 21, 1981, a grand jury subpoenaed the records of a company named Rimco and the brokerage accounts of Stix and Company for Miller, Miller Excavating, Century III, Rimco and M & E Security. These records indicated that hundreds of thousands of dollars had been embezzled from Stix and Company and had been channeled through Maeras and Miller. These documents certainly indicate that the IRS had the basis for tax fraud charges against Maeras and Miller for the years 1977–80.

Furthermore, on October 21, 1981, the IRS interviewed both Maeras and Miller. When Maeras was interviewed, he was served with a grand jury subpoena to produce records for Maeras Enterprises. During his interview, Miller was informed that he would be subpoenaed to testify before the grand jury about his involvement with Brimberry. The October 21 interview put both Maeras and Miller on notice that they had attracted the IRS's attention.

At the remand hearing, Miller testified that he decided to try to get a "good deal" and cooperate with the government after the October 21 interview. Miller testified that early in November 1981 he consulted an attorney about the matters he had discussed with the IRS agents on October 21. He told his attorney that substantial sums of money from a stock account at Stix and Company had been deposited into a bank account for Rimco, and that he and Brimberry had been withdrawing money from the Rimco account. Miller told his attorney at that first visit that no taxes had been paid on the money from the Stix account. Miller also stated that he had been taking checks from Stix and Company out to Las Vegas, cashing them, and giving the cash to Brimberry.

Miller testified that in October 1981 he knew he was in trouble because the government had found out about his activities. He stated that he was not motivated to cooperate with the government because of anything Brimberry had done or said. Miller indicated that he knew Brimberry had made a deal and had turned over records to the government, but he did not know what Brimberry had told the government. He testified that after the IRS agents interviewed him he decided to make the best deal he could because he knew that the government had found out about him. The plea agreement with the government was the result of Miller's desire to make the best deal he could for himself.

The district court found that Maeras had signed the plea agreement pursuant to his lawyer's advice because he wanted to get the best deal he could. The court also found that before Maeras signed the plea agreement he did not know that Brimberry had implicated him in the scheme and that he was not motivated to sign the agreement by anything Brimberry had said. The defendant has failed to supply a complete transcript, but on the basis of the record supplied, there is no reason for us to doubt the trial judge's findings. The defendant has failed to establish that the district court's findings were clearly erroneous.

The government established that it had gathered substantial documentary evidence against both Maeras and Miller before Brimberry began cooperating. This documentary evidence indicates that the government was investigating Maeras and Miller and would have been able to develop cases against them without Brimberry's cooperation. In their testimony, Maeras and Miller indicated that the interview by the IRS agents in October 1981 alerted them to the imminent discovery of their crimes. The October 21 interview convinced them to retain attorneys to negotiate agreements with the government. Maeras and Miller had sufficient notice of the government's interest in their activities to motivate them to cooperate. The government did not need to establish that Maeras and Miller actually knew or were informed of the details of the government's case against them. It was sufficient that the government established that it had developed cases against both of them before Brimberry began cooperating and that Brimberry's cooperation did not motivate them to make their agreements with the government.[4]

For the reasons stated above, the decisions of the district court are

AFFIRMED.

---

4. Because the government established that Miller's and Maeras's testimony was obtained independently of Brimberry's cooperation, we need not address the issues of whether Brimberry breached the immunity agreement and whether such a breach allowed the government to prosecute Brimberry for obstruction of justice. *Brimberry,* 744 F.2d at 587 (if the government proves at the remand hearing that Maeras and Miller testified because of the government's case against them, the defendant's conviction will stand). *See Kastigar v. United States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972) ("the prosecution [has] the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independently of the compelled testimony").