UNITED STATES of America,
Plaintiff–Appellee,

v.

Judd HIRSCHBERG and Richard
D. Lowrance, Defendants–
Appellants.

Nos. 91–2782, 91–2783.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1992.

Decided March 19, 1993.

Rehearing and Rehearing En Banc Denied
in No. 91–2782 May 27, 1993.

Rehearing and Rehearing En Banc Denied
in No. 91–2783 June 1, 1993.

Edward M. Genson, Marc W. Martin, Genson, Steinback, Gillespie & Martin, Chicago, IL, Peter .D. Keisler (argued), Paul Kalb, Sidley & Austin, Washington, DC, for Judd Hirschberg.

Dean J. Polales, Asst. U.S. Atty., Crim. Div., Barry R. Elden, Jerome N. Krulewitch (argued), Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, IL, for U.S. in No. 91–2783.

Jeffrey N. Cole (argued), Andrew T. Staes, Cole & Staes, Chicago, IL, for Richard Lowrance.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

BAUER, Chief Judge.

Judd Hirschberg and Richard Lowrance were indicted and convicted of altering or removing vehicle identification numbers, 18 U.S.C. § 511(a), and mail fraud, 18 U.S.C. § 1341. They appeal their convictions. Lowrance argues that various errors in the district court warrant reversal. Hirschberg adopts Lowrance's arguments, and also argues that the evidence is insufficient to support his conviction. We affirm in part and reverse in part.

I.

Judd Hirschberg and Richard Lowrance had a lot in common. They were young successful traders at the Chicago Mercantile Exchange, they saw each other daily, socialized together, vacationed together, and drove the same car—literally; from 1985–1988, Lowrance drove a silver 1981 Mercedes–Benz 380 SL sedan ("the silver Mercedes") that Hirschberg once owned. But in 1985 Hirschberg had reported the silver Mercedes stolen and collected a $43,-300 insurance settlement for it.

At some point, the silver Mercedes got a "new" vehicle identification number ("VIN"). It now had the VIN from a dark green 1974 Mercedes–Benz 450 SL two-seat convertible. Through a series of title applications using the new VIN, Lowrance was able to disguise the silver Mercedes and

Dean J. Polales, Asst. U.S. Atty., Crim. Div., Jerome N. Krulewitch, Asst. U.S. Atty. (argued), Crim. Receiving, Appellate Div., Chicago, IL, for U.S. in No. 91–2782.

avoid its detection as a stolen vehicle. In September 1988, the switch was noticed by two Miami, Florida police detectives during a routine observation of vehicle numbers. The detectives knew by looking at the VIN that the silver Mercedes had been re-tagged. Shortly thereafter, the detectives, Campbell and Smylie, seized the car which was being driven by a friend of Lowrance's. The detectives learned that it was registered to Lowrance's mother and Lowrance was designated as the lienholder. Investigation revealed that not only was it originally Hirschberg's car, but Hirschberg's mobile telephone was inside.

On September 1, 1988, Campbell telephoned Hirschberg at his girlfriend's home in Aspen, Colorado to tell him his car had been recovered and that Lowrance was implicated in the theft. Hirschberg expressed disbelief that a friend, who was also a multi-millionaire, would have anything to do with a stolen car. Campbell asked Hirschberg for Lowrance's telephone number. Hirschberg declined to give the number and told Campbell that Lowrance would not be available for a few days, but he told Campbell that he would deliver a message. Telephone records reveal that the next day a call was placed from Lowrance's office to the Miami Police Department, but neither Smylie nor Campbell spoke to Lowrance. Within seconds of that call, another call was placed from Lowrance's office to the Aspen location where Hirschberg was staying.

Campbell finally spoke to Lowrance on September 14. Lowrance told him that he had purchased the silver Mercedes in response to a newspaper advertisement, but he could not remember from whom he bought it, where he bought it, or how much he paid. Lowrance also told Campbell that he and Hirschberg were only business associates, and that their friendship did not extend beyond work. He claimed that he did not know that Hirschberg's silver Mercedes had been stolen.

## II.

### A. Richard Lowrance

■ Lowrance argues that his conviction should be reversed because several errors occurred at trial. The first alleged error concerns Detective Campbell's possible bias against the defendants, exhibited by Campbell's unwillingness to meet with, or talk to, defense attorneys before trial. Campbell was a prosecution witness. Before he took the stand a sidebar was held to discuss defense counsel's cross examination on the bias issue. The prosecution proffered Campbell's rehabilitation testimony on the bias issue. The testimony was not favorable to defense counsel (and perhaps the defendants). The district court determined that if defense counsel questioned Campbell about his reluctance to talk, the prosecution could question Campbell about his reasons. (Tr. 678–82). Despite knowledge that the rehabilitation testimony might be damaging, defense counsel pursued the bias issue. (Tr. 734–38).

On redirect, the prosecutor asked Campbell whether he was concerned about a "possible distortion of the situation." Campbell answered affirmatively. (Tr. 827). On recross, the defense probed further, seeking to establish that Campbell's fear of distortion was unreasonable. (Tr. 831–34). This opened the door for further redirect, and the prosecutor asked Campbell why he feared his words would be distorted. Just before Campbell replied, the district court admonished the jury that Campbell was merely testifying to his personal state of mind and that his statements could not be accepted for the truth of the underlying assertion. (Tr. 835). Campbell then testified that because of his prior experience in thousands of court appearances, he believes that defense attorneys regularly and routinely take his words out of context, twisting and distorting them into misstatements of fact. He added that "[i]t happens every time." (Tr. 835–37).

■ We review the district court's decision to allow Campbell's explanatory testimony for an abuse of discretion. *United States v. Glecier*, 923 F.2d 496, 503 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991). Lowrance argues that Campbell's testimony about defense lawyers was unfairly prejudicial and warrants reversal. We have stated that

"[a]ttacks on the honesty and sincerity of defense counsel are improper." *United States v. Sblendorio,* 830 F.2d 1382 (7th Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988). But in *Sblendorio* and the other cases Lowrance cites, the improper attacks were made by opposing counsel, not by a hostile witness.

Lowrance argues that rehabilitation evidence that justifies witness bias through the defendant's conduct may be improper. J. WIGMORE, EVIDENCE, IIIA § 952 at 799–801 (Rev. ed. 1970). Lowrance's reliance on Wigmore is misplaced because he has not established Wigmore's threshold requirement that the witness exhibit hostility toward the defendant. We do not believe Campbell was hostile to Lowrance. We acknowledge that he exhibited bias against defense attorneys generally, but Campbell neither said nor did anything to indicate that his bias against defense counsel was strong enough to impugn his testimony against the defendant. The opportunity for a witness to explain through rehabilitation has been called "a basic necessity for redirect" and "the universal balm for the wounded witness." J.W. JEANS, SR., LITIGATION, § 17.07 at 1277 (2d. ed. 1992). We will not deny the opportunity to rehabilitate without a stronger indication of hostility or bias.

Lowrance also relies on *United States v. Pintar,* 630 F.2d 1270 (8th Cir.1980), for the proposition that damaging explanatory evidence is inadmissible. In that case, the witness was cross examined about her dislike for one of the defendants. She testified about several of the defendant's acts that she disliked. On redirect, the prosecution asked whether any other reason existed causing her to dislike the defendant. The witness' answer was very damaging— she replied that she believed the defendant (and her codefendant husband) were running an illegal kickback scheme, and she cited proof of her suspicion. The Eighth Circuit held that the testimony was unfairly prejudicial and should have been excluded because it was not relevant for a rehabilitative purpose. *Id.* at 1284.

The facts in *Pintar* are distinguishable from those here. In that case, the testimony was not appropriate for rehabilitation because it was inflammatory rather than explanatory. It introduced "other crimes" evidence against the defendants, which was improper under Federal Rule of Evidence 608(b). In Lowrance's case, Campbell explained why he distrusted defense counsel, not the defendant. The information was not inflammatory and did not introduce any evidence of Lowrance committing bad or illegal acts. Finally, unlike *Pintar,* Campbell's explanation was relevant for a rehabilitative purpose.

In *United States v. DiCaro,* 852 F.2d 259 (7th Cir.1988), we considered a challenge to a district court's denial of a defendant's right to fully explore a witness' bias. *DiCaro* illustrates that the typical manner used by defense counsel to limit potentially damaging rehabilitation testimony is to narrowly define cross examination issues. In that case, the defense sought to introduce evidence of witness bias during cross examination. The prosecution objected to the evidence and argued that it did not clearly reveal bias. The prosecution also argued that damaging explanatory evidence would be offered to rehabilitate the witness. The court stated "[I]f I permit you to conduct the cross examination that you contemplate, I am certainly going to permit the Government to seek to rehabilitate [the witness] here by those other suggestions." *Id.* at 262. Although the district court ruled that the testimony was admissible because as relevant for a rehabilitative purpose, the court limited the potential for bias by limiting the cross examination. *Id.* at 262. In this case, rather than limiting cross examination to prevent the damaging testimony, defense counsel continued to question Campbell, which led to the damaging testimony.

■ We consider three final points. First, the district court instructed the jury that Campbell's statements were representative of his state of mind, and could not be taken as true. The court's statements were designed to ensure that the defendants were not unduly prejudiced by Camp-

bell's comments. *United States v. Abel,* 469 U.S. 45, 55, 105 S.Ct. 465, 470, 83 L.Ed.2d 450 (1984). We presume that a jury obeys such admonitions. *Cf. United States v. Neely,* 980 F.2d 1074, 1082 (7th Cir.1992). Second, defense counsel was not surprised by Campbell's testimony. Defense counsel knew that Campbell would be given an opportunity to explain and what that explanation would be.

■ The third point concerns our review. If defense counsel had not pursued the issue through a second round of cross examination, Campbell would not have delivered the knock-out punch on further redirect. Those were strategic decisions. In instances when defendants attack trial counsel's strategy choices, we offer enormous deference to those choices, and we do not rely on the "perfect vision of hindsight." *United States v. Phillips,* 914 F.2d 835 (7th Cir.1990) (citing *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984)); *cf. United States v. Weston,* 708 F.2d 302, 307 (7th Cir.), *cert. denied,* 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 340 (1983) (no evidence showing that counsel's decision to impeach witness, resulting in rehabilitation testimony concerning other crimes, resulted from negligence or ignorance rather than from informed professional deliberation). We see no reason to second-guess counsel in these circumstances. The defendants chose to proceed with the cross examination and test the district court's discretion. The district court did not abuse its discretion. *Cf. Glecier,* 923 F.2d at 503 (management of cross examination and amount of detail to which witness is allowed to testify within trial court's wide discretion).

■ Lowrance also challenges Campbell's testimony regarding the telephone calls from Lowrance's office to the police station. Telephone records suggest that Lowrance called the Miami Police Department on September 2, and within seconds of that call, he telephoned Hirschberg in Aspen. At oral argument, the defense asserted that Lowrance spoke with Campbell and learned of Hirschberg's association with the silver Mercedes. In his brief, however, Lowrance's theory is that he spoke with Campbell or someone else at the Miami Police Department, who told him of Hirschberg's association with the case. (Lowrance Br. 15–22).

Campbell testified that he did not talk to Lowrance, and therefore did not tell him of Hirschberg's association with the car until September 14. The prosecution sought to establish that Campbell was the only person who could tell Lowrance of Hirschberg's association with the car because Campbell carried all his files with him in a box wherever he went. Unless Lowrance established that he had a conversation with Campbell, the calls infer "guilty knowledge"—that Lowrance knew of Hirschberg's association with the car because either he stole the car from Hirschberg, or they planned the crime together.

Lowrance sought to discredit Campbell's denial of the September 2 conversation by calling a witness who would flatten the "box theory." Apparently this strategy was to serve two purposes. The first was to show that if Campbell lied about the carrying the box, he lied about talking to Lowrance on September 2. The second was to show that the box theory was implausible, and that other officers had access to the information and could have given it to Lowrance.

■ The witness was an Illinois police detective specializing in auto theft who had never worked in Florida and did not know Campbell. The witness was *going to testify* that he had never heard of an auto theft detective protecting his files in the manner that Campbell did. The trial court prohibited the witness from testifying on this issue. Lowrance challenges that decision under Federal Rule of Evidence 702. Rule 702, however, applies to witnesses that are qualified as experts, and the defense did not seek to qualify the witness as an expert. (Tr. 1188). Therefore, Rule 702 does not apply. Next, Lowrance argues that the testimony was relevant and should have been admitted pursuant to Federal Rule of Evidence 402. Relevancy is weighed by whether the evidence makes a fact more or

less probable. Fed.R.Evid. 401. The witness' knowledge of police practices in the Chicago area does not make it more or less probable that Campbell toted his box everywhere. Although not acknowledged as such, the witness' testimony boiled down to "expert opinion." Expert opinion is gained from a "special skill, knowledge, or experience," and is a reasoned decision drawn from the witness' expertise. *United States v. Benson*, 941 F.2d 598, 604 (7th Cir.1991). The witness had no knowledge of police practices in Miami and did not know Campbell. Because he had no special knowledge or experience in the manner in which a Miami Police officer protects his files, the jurors were as able as the witness to determine whether Campbell's box theory was farfetched. The district court did not abuse its discretion when barring the witness' testimony.

■ Lowrance raises various other claims. His argument that the prosecution misstated evidence about the mobile telephone is without merit. His next claim is that John Rasmussen, a prosecution witness, was allowed to give inadmissible testimony. Rasmussen, who was with Hirschberg the night the car was discovered missing, was asked whether Hirschberg had ever talked about the silver Mercedes and if he told him "how the car was recovered or any other details." (Tr. 219). Rasmussen stated that Hirschberg might have mentioned that the car was recovered. (Tr. 220). Lowrance objected at sidebar and moved for a mistrial and severance. Lowrance claimed that Hirschberg's silence about Lowrance's possession of the car is not relevant because Rasmussen and Hirschberg were not close friends. Lowrance further argued that the prosecution should not have introduced the testimony because a motion was still under consideration to bar similar testimony from Hirschberg's girlfriend. Lowrance raises the same challenges here. The district court agreed that Rasmussen's testimony should not be admitted, and instructed the prosecutor to move on. The court determined that the damage from the testimony was slight, and denied the motions. The court offered to give a limiting instruction if the

defense desired, but none was requested. We review these decisions for an abuse of discretion, and will reverse only on a showing of actual prejudice. *United States v. Koen*, 982 F.2d 1101, 1113 (7th Cir.1992).

Lowrance did not object until after the question was answered. Had the objection come sooner, the judge could have barred the testimony. Much like the cross examination discussed previously, the decision to object after the witness answered was strategic, and we will not alter questionable strategy choices because of hindsight.

■ Furthermore, the district court did not abuse its discretion when finding that no severance was required. Despite Lowrance's arguments to the contrary, *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), is not analogous to the situation here. In *Bruton*, a defendant confessed, implicating his codefendant. The information was highly incriminating, and the Court held that a substantial risk existed that the jury would not be able to ignore such damning testimony. *Id.* at 126, 88 S.Ct. at 1622. *Bruton* is easily distinguishable from this case; the testimony here was not a confession, it was not delivered by a codefendant, and if it implicated Lowrance in the crime at all, that implication was very minor. We agree with the district court that Lowrance was not unduly prejudiced by Rasmussen's testimony.

■ Lowrance also argues that the jury was biased against him because of his wealth. He claims that because he was going to use his wealth to illustrate that he lacked motive, the district court should have questioned the jurors about whether they could give Lowrance a fair trial. The decision whether to ask particular voir dire questions lies within the district court's discretion, and we will not reverse unless that discretion has been abused. *United States v. McAnderson*, 914 F.2d 934, 943 (7th Cir.1990). At oral argument, the defense stated that the wealthy are a suspect class and suffer greater prejudice than do racial minorities, a fact "born out by scores of cases." We expressed our skepticism,

but were assured that "legions of cases" recognize this class prejudice, and those cases were "set forth and discussed at length in the brief." Try as we might, we find no cases in the defendant's brief or in our research that identify the wealthy as a suspect class. We do, however, find cases that state that wealth is not a suspect classification. *See Maher v. Roe*, 432 U.S. 464, 471, 97 S.Ct. 2376, 2381, 53 L.Ed.2d 484 (1977) (financial need alone does not identify a suspect class for equal protection purposes); *see also San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Court unwilling to identify "suspect class" based on income). The district court considered more than 100 questions submitted by the defense. The practical realities of trial do not allow the district court to ask all tendered questions. The court did not abuse its discretion by omitting a question about speculated bias against the wealthy.

■ Along that same line, Lowrance argues that the prosecutor improperly played upon class bias in his rebuttal by arguing Lowrance's wealth to the not-so-wealthy jury. Because the defense did not object to these remarks, we review for plain error, considering whether a fundamental miscarriage of justice occurred. *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); *United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir.1993). Lowrance argues that *United States v. Stahl*, 616 F.2d 30, 31–33 (2d Cir.1980), instructs that persistent appeals to class prejudice against the wealthy are improper, and therefore Lowrance's conviction should be reversed. In that case, the prosecutor went out of his way to emphasize the defendant's wealth, and stressed that the defendant's greed and love of money are what caused him to commit the crime. The district court stated that the prosecutor impermissibly equated success, affluence and business drive with greed and corruption. *Id.*

The prosecutor's treatment of Lowrance did not match the prosecutor's conduct in *Stahl*. Here, the defense argued that Lowrance was wealthy and lacked motive to commit the crime. In response, the prosecution argued that just because Lowrance was wealthy did not mean he did not commit the crime. The prosecution's theory of the case was that Lowrance was arrogant and simply flaunting the law. During closing, the prosecution argued that the law should apply equally to people at all economic levels: rich, poor, or middle class. This argument is different from the one which was held improper in *Stahl*. There, the prosecutor stressed that the defendant committed the crime (paying a bribe) because of the overwhelming long term financial benefit that would fulfill the defendant's greedy desires—desires illustrated by the wealth and business success he had already achieved. *Id.* The prosecutor did not emphasize Lowrance's wealth to a degree that wrought a miscarriage of justice. Plenty of evidence existed to establish Lowrance's role in the crime, most notably the silver Mercedes, the mobile telephone, and the various title documents altering the registration information. (Govt. Exh. B). Lowrance is not a victim of plain error.

■ Lowrance's final issue concerning wealth is the district court's decision not to instruct the jury on absence of motive. We will not interfere with the district court's choice of jury instructions if the issues are treated fairly and adequately. *United States v. McNeese*, 901 F.2d 585, 607 (7th Cir.1990). Here, the defense sought to use wealth to illustrate lack of motive. Motive is not an essential element of a crime, however, and we do not believe that the jury must be given an absence of motive instruction whenever it is requested. The trial provides ample opportunity for the defense to establish and argue lack of motive. Nothing here indicates that the jury was not adequately and fairly instructed.

Last, Lowrance claims he was sandbagged by the prosecution. In the opening statement, the defense told the jury that no narcotics were found in the silver Mercedes, and therefore the police were not justified in keeping the car and tearing it apart. Campbell was cross examined about this issue, and testified that traces of

drugs were found in the car. He acknowledged that a report reflected this information, although the defense knew nothing of it. (Tr. 793–97). At that time, the report was produced from Campbell's briefcase which was sitting on the prosecution table. Lowrance claims that the prosecution knew he would be arguing the fact that no drugs were found in the car, and knew that the report refuted this testimony. He argues that the inaccuracy seems to support Campbell's earlier allegations that defense attorneys distort information, and further prejudiced the jury against Lowrance. In response, the prosecution claims they did not know that the report existed until the moment it was produced at trial, and that the report was not material to the defense.

The defense has not shown that the prosecution had the report and failed to turn it over to them. *See United States v. Brimberry,* 803 F.2d 908, 913 (7th Cir.1986), *cert. denied* 481 U.S. 1039, 107 S.Ct. 1977, 95 L.Ed.2d 817 (1987) (appropriate to consider whether prosecution acted in bad faith when the materiality of the evidence has not been determined). In addition, the testimony did not implicate Lowrance in illegal drug dealings. Although· he "owned" the car, Lowrance was in Chicago and the car was in Miami. The testimony was clear that the car was at the disposal of Lowrance's girlfriend and others. No evidence links Lowrance with the traces of narcotics. In addition, the narcotics search was mentioned only in passing during defendant's opening statements, and the issue was completely peripheral to the case.

### B. Judd Hirschberg

■■ Hirschberg adopts all of Lowrance's arguments raised on appeal, but they benefit him no more than they did Lowrance. Hirschberg also challenges the sufficiency of the evidence supporting his conviction. He faces a difficult task because he must show that when considering the evidence in the light most favorable to the government, no rational juror could find beyond a reasonable doubt that the elements of the crime had been fulfilled. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

To prove mail fraud, the government must show that the defendant participated in a scheme to defraud and used the mail to execute or attempt to execute that scheme. 18 U.S.C. § 1341; *Koen,* 982 F.2d at 1106. Circumstantial evidence may be the sole support for the conviction. *United States v. Badger,* 983 F.2d 1443, 1449 (7th Cir. 1993). The evidence showed that Hirschberg was a close friend and business associate of Richard Lowrance both before and after the silver Mercedes was reported stolen. The evidence also showed that Hirschberg benefitted from the incident. He collected $43,300 from his insurance company for the replacement cost of the car, several thousand dollars more than what he would have received if he sold the car. He also tried to recover insurance proceeds for the mobile telephone. Last, telephone records revealed that a call was placed from Lowrance's office to the Miami Police and immediately following that call, another was placed to the Aspen location where Hirschberg was staying. The inference taken in the light most favorable to the government is that Lowrance called Hirschberg to get their stories straight. On the whole, the evidence is sufficient to sustain his conviction.

Despite establishing mail fraud, the government has produced no evidence linking Hirschberg to the VIN undertaking. Therefore, we cannot find as a matter of law that Hirschberg's VIN conviction was supported by sufficient evidence.

### III.

Hirschberg and Lowrance had better luck with arbitrage than they did with crime. Lowrance's conviction is AFFIRMED in all respects, and Hirschberg's mail fraud conviction is AFFIRMED. Hirschberg's conviction for altering the vehicle identification number, however, is REVERSED. Hirschberg's case is REMANDED to the district court for resentencing in the light of this reversal.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

The case against Lowrance is persuasive and his evidentiary objections ill-founded

(as the majority demonstrates). But the mail fraud case against Hirschberg is so extraordinarily thin as to require reversal of his conviction and a new trial.

The crucial and damning evidence against Hirschberg was the possession by Lowrance of one of Hirschberg's original car keys, i.e., a key furnished to him by the manufacturer. This was obviously very potent evidence. Unfortunately, the government discovered after the trial had started that the key in Lowrance's possession was *not* one of the originals provided by the manufacturer. This discovery wiped out most of the case against Hirschberg.

After the loss of the "key" evidence, the government was left with only three contentions upon which to rely: (1) Hirschberg and Lowrance knew each other well, before the disappearance of the car; (2) Hirschberg told the police he had left the doors of the car unlocked before it vanished; and (3) immediately after Lowrance spoke to the Miami police, a call was placed from Lowrance's phone to an apartment in Colorado belonging to Hirschberg's girlfriend. Of these, the first contention smacks of guilt by association. Mere association with people engaged in criminal conduct is itself no basis for conviction. *Cf. United States v. Williams*, 798 F.2d 1024, 1028 (7th Cir. 1986) (mere association with conspirators is not even "slight evidence" that defendant was a member of the conspiracy). A prior relationship between alleged schemers could buttress an inference, well-supported by other evidence, that they engaged in a criminal enterprise.[1] But the paucity of the other evidence against Hirschberg is such that the jury's verdict could only rest upon the following syllogism: Lowrance is guilty, Lowrance knew Hirschberg, there-

fore, Hirschberg is guilty.[2] This reasoning is antithetical to the principle that guilt in a criminal proceeding is "individual and personal." *Kotteakos v. United States*, 328 U.S. 750, 772, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946).

The second piece of evidence upon which the government relies, Hirschberg's statement to the police that he left the doors to his car unlocked the night it was taken, is as consistent with innocence as with guilt and thus proves nothing. *United States v. Delay*, 440 F.2d 566, 568 (7th Cir.1971) ("Where the evidence as to an element of a crime is equally consistent with a theory of innocence as with guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt."). The government contends that this statement by Hirschberg links him to the crime because it was an attempt by Hirschberg to distance himself from the theft. But it is, of course, equally possible that the car was stolen, either by Lowrance acting alone or in concert with someone else, precisely because its doors were left unlocked. Moreover, if Hirschberg had said that he *had* locked the car's doors, the government would likely have argued that this inculpated Hirschberg since it would have been a calculated attempt not to look suspicious. But the statement that the doors were locked would also have been consistent with innocence, insofar as it would have tended to show that Hirschberg had taken reasonable measures to secure his car.

Finally, the government relies upon the sequence and timing of certain phone calls made to and from telephone numbers associated with Hirschberg and Lowrance respectively. Considered in the light most favorable to the government, this evidence does indeed suggest that "Lowrance called

---

1. Total strangers, of course, could not scheme together in violation of the mail fraud statute. But a preexisting relationship could facilitate a criminal scheme. Thus, the existence of a relationship between two or more people which antedated alleged criminal activity might make it marginally more probable that they later became part of such a collective criminal undertaking.

2. The government's argument that Hirschberg and Lowrance must have been scheming together because they remained on friendly terms after the car disappeared makes little sense. Assuming Lowrance, either alone or with others, did in fact steal Hirschberg's car, Hirschberg, of course, would not be privy to this information and would have no reason to alter his relationship with Lowrance. And Lowrance would also attempt to preserve the status quo so as to not arouse Hirschberg's suspicion.

Hirschberg to get their stories straight." *See ante* at 1516. Ordinarily, of course, this would be enough to support a jury verdict. But we are dealing here with evidence—proof of the *mere existence* of certain telephone conversations—that is rather unusual, if not unique. Even if we permit the government the inference that Hirschberg and Lowrance were parties to the conversations, we can only speculate about what was said. Although it is certainly possible that Hirschberg and Lowrance were discussing ways to "get their story straight," it is equally possible, given their prior relationship that the government took such care to establish, that Lowrance called Hirschberg to attempt to explain how it was that he (Lowrance) came into possession of Hirschberg's missing, and presumably stolen, car. Or Lowrance may have simply called Hirschberg to have a friendly chat. The point is that we have no way of knowing the content of the conversation at issue. Without such knowledge, the government's case in this respect consists of inference piled upon inference and does not adequately support Hirschberg's mail fraud conviction. *See United States v. Covelli*, 738 F.2d 847, 859 (7th Cir.), *cert. denied*, 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984).

All of this evidence taken together is no more persuasive than each piece considered separately. Although many bricks may make a wall, here the government has no bricks. Because there seems to be such a strong likelihood that Hirschberg was impermissibly convicted simply because of his relationship with Lowrance, I would order a new trial for Hirschberg. *See United States v. Morales*, 910 F.2d 467, 468 (7th Cir.1990) (holding that a new trial may be ordered when "the complete record ... leaves a strong doubt as to the defendant's guilt, even though not so strong as to require a judgment of acquittal."). I, therefore, respectfully dissent to the extent indicated.