**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Paul DiCARO, Defendant–Appellant.**

**No. 87–1891.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1988.

Decided July 15, 1988.

Rehearing Denied Aug. 19, 1988.

Marvin Bloom, Chicago, Ill., for defendant-appellant.

Chris C. Gair, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, Jr., FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Defendant appeals from his conviction for involvement in a scheme to transport stolen barrels of electrocobalt, alleging trial error by the district court and prosecutor. He also appeals from an additional sentence he received under 18 U.S.C. § 3147 for committing the offenses while released on bond. We find no trial error and affirm the underlying convictions, but vacate the additional two year sentence under § 3147.

## I.

In January of 1983, Paul DiCaro was released on bond pending trial for racketeering in violation of 18 U.S.C. §§ 1951 and 1962(c). He was convicted on both counts on June 22, 1983 and sentenced to ten years in prison, but remained free on bond pending appeal. On April 26 and 27, 1985, before this court ruled on DiCaro's appeal from his racketeering convictions,[1] 244 barrels of electrocobalt worth $1.5 million were stolen from United Warehouse in Chicago Heights. The government later charged DiCaro with planning and organizing this burglary. He was indicted on charges of conspiring to transport stolen goods in interstate commerce, 18 U.S.C. § 371, transporting stolen goods in inter-

state commerce, 18 U.S.C. § 2314, and for having committed these offenses while released on bond, 18 U.S.C. § 3147.

Before trial DiCaro moved to dismiss the § 3147 counts on the ground that he was released on bond on January 17, 1983, twenty-one months before the October 12, 1984 effective date of § 3147. The district court denied the motion and the case proceeded to trial before a jury. DiCaro did not deny at trial that the burglary had occurred essentially in the manner alleged. Rather, his defense was that a man named Mickey Gurgone had actually played the role in the burglary scheme which the government and its witnesses attributed to DiCaro. This defense was unsuccessful; DiCaro was convicted on all counts. He was sentenced to concurrent prison terms of five years on the conspiracy count and eight years for each of the transportation counts. DiCaro received an additional sentence of two years under § 3147 for each count, with these sentences also to run concurrently. The two year § 3147 sentence was imposed consecutive to the underlying eight year sentence, for a total of ten years' imprisonment.

DiCaro presses three arguments on appeal. He first alleges that the district court erred in refusing to allow cross-examination of two government witnesses regarding a taped conversation they had on September 18, 1986. In that conversation, two members of the burglary crew mentioned that a bomb had exploded at DiCaro's mother's house and that as a result DiCaro would not be testifying at trial. Both conversants then laughed about the bombing. DiCaro contends on appeal that this conversation showed the bias of these witnesses and should therefore have been admitted.

DiCaro also alleges that the prosecutor made improper references in his closing argument to DiCaro's failure to present an alibi defense. During closing argument,

---

1. This court affirmed DiCaro's conviction on count I and reversed on count II on September 3, 1985. *United States v. DiCaro*, 772 F.2d 1314 (7th Cir.1985), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986). Bond was revoked on November 1, 1985, and DiCaro surrendered to begin his sentence on November 12, 1985. He was indicted on the new charges at issue here on October 29, 1985.

DiCaro's counsel attacked the credibility of the government witnesses. He stressed that witnesses Salvino and Kahmark, members of the burglary crew, were frightened of Gurgone, who was the real mastermind of the burglary, and were reluctant to testify against him. The defense alleged that these witnesses therefore substituted DiCaro's name for Gurgone when questioned by the FBI and prosecutors. In response to this argument, the prosecutor stated:

> Why would they [Salvino and Kahmark] risk being found out as liars. Why would they risk perjury. Why would they risk an alibi.
>
> DiCaro [supposedly] wasn't there. For all they knew he would be able to prove he was in Las Vegas that day.

The court sustained the defendant's objection to these remarks. The prosecutor went on to argue that witness Rodriguez, the foreman of Chicago Metal Works, had similarly told the truth about DiCaro's participation.

> [W]ould he lie and falsely accuse Paul DiCaro. No. Because that would keep him in it. He would have to testify, he would risk being found out a liar, he would risk that somebody could prove DiCaro was in San Francisco that day.

The defendant did not object to this portion of the argument.

Finally, DiCaro reasserts his claim that § 3147 should not have been applied to him, because he was released on bond before the statute's effective date. We find that the district court did not err in refusing to allow cross-examination regarding the bombing, and that the prosecutor's remarks, while ill-chosen, do not constitute error when considered in context. However, we reverse the district court's holding that § 3147 was properly applied to DiCaro, and therefore vacate his concurrent two-year sentences under that statute.

## II.

■ DiCaro argues that by limiting his cross-examination of Salvino and Jurek, two members of the burglary crew, the district judge violated his sixth amendment right to confront the witnesses against him. The confrontation clause protects not only the defendant's right to physically confront a declarant, but the right to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Delaware v. Fensterer*, 474 U.S. 15, 19, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (*quoting Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)). The right to an opportunity for effective cross-examination, however, does not give defense counsel license to conduct the cross-examination as she chooses. A trial judge has broad discretion, *United States v. Wellman*, 830 F.2d 1453, 1465 (7th Cir. 1987), to impose reasonable "limits on defense counsel's inquiry into the potential bias of a prosecution witness ... based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). To demonstrate error, a defendant must show that, as to a particular witness, "he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias...." *Id.* at 680, 106 S.Ct. at 1436.

During cross-examination of Salvino and Jurek, DiCaro was allowed to expose sufficient information to enable the jury to evaluate his theory of defense and to make "a discriminating appraisal of the witness's motives and bias." *United States v. De Gudino*, 722 F.2d 1351, 1354 (7th Cir.1983). *See Wellman*, 830 F.2d at 1465–66; *United States v. Muelbl*, 739 F.2d 1175, 1185 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 388, 83 L.Ed.2d 322 (1984). Salvino admitted during cross-examination that he was angry with DiCaro for accusing him of involvement in two crimes he did not commit. Salvino also admitted trying to discredit DiCaro and telling Jurek that he "would give up five years of [his] life if [he] could put [his] hands around Paul DiCaro's neck." The defendant also exposed the fact that DiCaro cheated Salvino out of

burglary proceeds, creating a strong likelihood of bias.

Jurek was also cross-examined on his bias against DiCaro. He admitted to feeling cheated by DiCaro on money and "other matters." The defendant, however, chose not to pursue what these other matters might be. Defense counsel also impeached Jurek on his plea agreement and on previous lies.

After establishing Salvino's desire to discredit DiCaro, defense counsel sought to play the tape of a conversation between Salvino and Jurek[2] which occurred on September 18, 1986, some time after Jurek began cooperating with the government's investigation into the burglary. In the tape, Salvino mentioned that someone had bombed DiCaro's mother's house and as a result DiCaro would not take the stand. Both participants then laughed. Out of the presence of the jury, the government argued that the tape was ambiguous as to whether Salvino thought DiCaro would be "taking the stand" at his own or another's trial. The conversation indicated only that Salvino and Jurek now realized, contrary to their previous uncertainty, that DiCaro would not testify at trial as a government witness because someone had sent him a message not to testify. Even if the conversation were understood to be a reference to the likelihood of DiCaro taking the stand at his own trial, the government further asserted, its admission into evidence would lead to an examination of the many possibilities why DiCaro might choose not to testify. After recessing over the lunch hour to consider the propriety of playing this segment of the tape for the jury, the judge decided to exclude it. Agreeing with the government's view, the court told defense counsel:

> [I]f I permit you to conduct the cross-examination that you contemplate, I am certainly going to permit the Government to seek to rehabilitate Mr. Salvino here by those other suggestions.

Now, what we are then getting into is the whole subject of the bombing, who did the bombing, what kind of people are involved, all of which we have avoided.

We then get into the—if Mr. DiCaro does not testify in his own behalf in this case, we then get into the implications of this conversation on that fact, and whether the Government is entitled to tell the jury of other explanations.

And, you know, there are several other explanations for not testifying in the case. One, of course, is the prior conviction which would become admissible. Another—and I'm not suggesting that I would permit this ... is that [defense counsel] wouldn't let him perjure himself ... [W]e are just opening up an enormous can of worms ... and we are going to divert the jury's attention from the real issues in the case.

*See* Fed.R.Evid. 403.

The district court properly exercised its discretion to preclude "confusing cross-examination into areas already sufficiently explored to permit the defense to argue personal bias and testimonial unreliability." *United States v. Robinson*, 832 F.2d 366, 373 (7th Cir.1987) (finding no abuse of discretion where court precluded examination of a police investigator to establish severity of criminal charges dropped against government witness in exchange for his testimony). *See United States v. Rodgers*, 755 F.2d 533, 548 (7th Cir.), *cert. denied* 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985) (no abuse of discretion where court precluded examination of government witness about nature of prior charges which were dropped, because the issues this questioning was designed to illuminate—the witness' motive to lie and when he began cooperating with the government—had been sufficiently explored). The defendant's theory that the witnesses were predisposed to be biased against him was sufficiently explored; the district court was within its discretion to exclude one manifestation of that bias in order to avoid prejudice and confusion of the issues.

---

**2.** The defendant also asked to play a tape of a conversation, already discussed during direct and cross-examination, in which the witnesses planned to discredit DiCaro. The trial judge allowed the defendant to play this tape to the jury.

III.

■ DiCaro next contends that the prosecutor's remarks during closing argument impermissibly burdened his privilege against self-incrimination. The fifth amendment prohibits a prosecutor from making direct, adverse comments on a defendant's failure to testify in his own behalf. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). An indirect adverse comment may also violate the privilege against self-incrimination if the language appears "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Lyon,* 397 F.2d 505, 509 (7th Cir.), *cert. denied,* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968). There has been some confusion in this circuit about what types of comments impermissibly infringe on the privilege against self-incrimination. *United States v. Sblendorio,* 830 F.2d 1382 (7th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988) (reviewing conflicting cases). We have recently clarified that the "defendant's decisions about evidence other that his own testimony do not implicate the privilege, and a comment on the defendant's failure to call a witness does not tax the exercise of the privilege." *Id.* at 1391. A prosecutor's assertion that evidence is uncontradicted is impermissible only if it is highly unlikely that anyone other than the defendant could rebut the evidence. *See Adkins v. Greer,* 791 F.2d 590, 597–98 (7th Cir.1986); *Burke v. Greer,* 756 F.2d 1295, 1301 (7th Cir.1985).

■ To the extent that the prosecutor's comments alluded only to a failure to put on alibi witnesses, therefore, they are not improper. In *Adkins,* the defendant was caught in "recent, unexplained possession of stolen property." During closing argument, the government suggested several times that the government's evidence was uncontradicted, and that if the defense had witnesses who could refute the inference that Adkins actually committed the robbery, it should have put them on the stand. Although this was close to an indirect reference to the "type of rebuttal evidence that only Adkins could give," we held that the comments did not naturally and necessarily remind the jury that Adkins himself did not testify. Rather, the implication was simply that there were no favorable witnesses. *Id.* at 598.

■ The question before us is whether the prosecutor's comment that Salvino and Kahmark were unlikely to lie given the possibility of an alibi defense implied that the defendant himself failed to take the stand to assert that he was elsewhere on the night of the burglary. Because the essence of the defendant's theory was that the government's witnesses were not reliable, the prosecutor was entitled to "imply that the failure of the defense to present available evidence (other than the defendant's testimony) in opposition to the government's witnesses supports a conclusion that the government's witnesses are reliable." *Sblendorio,* 830 F.2d at 1392. The Assistant United States Attorney in this case, however, came dangerously close to commenting on DiCaro's failure to take the stand. The second of the prosecutor's challenged statements, that the government witnesses would not lie for fear that "somebody" might be able to prove that DiCaro was out of town on the date of the burglary (or by implication that the defense could produce some other alibi), would not naturally appear to be a comment on DiCaro's failure to provide alibi testimony. DiCaro's whereabouts were not something highly likely to be known only to DiCaro.

The first of the prosecutor's challenged references, however, is more problematic. The prosecutor urged the jury to consider that "[f]or all [the witnesses] knew [DiCaro] would be able to prove he was in Las Vegas that day." There is a difference (though a tenuous one) between arguing that DiCaro would be able to "prove" something and that he would be able to "testify" to something; he could "prove" his whereabouts by presenting other evidence (for example hotel or restaurant receipts or alibi witnesses). Nonetheless, if the prosecutor had used this language in the context of a direct challenge to DiCa-

ro's failure to prove his whereabouts in the face of government evidence of his complicity, it might have approached a fifth amendment violation. These comments were not made in the context of discussing the defendant's failure to testify to refute the government's case, however; they were a step further removed. The prosecutor was endeavoring to rehabilitate his witnesses' credibility in the face of the defendant's allegations that they had lied in virtually every aspect of their testimony about DiCaro. In this context, the commentary must have been understood by the jury to refer to the implausibility of the defendant's arguments that these witnesses would have felt free to "lie at will." These statements would not, therefore, have naturally and necessarily seemed to a jury a comment on DiCaro's failure to testify.

## IV.

■ Finally, DiCaro claims that § 3147 should not be construed to apply to him, because he was released on bond prior to the statute's effective date. DiCaro claims that, because the sentence enhancement provision of the new Bail Reform Act did not exist when he was released on bond, he was never notified that if he committed another crime while released he would receive punishment in addition to the sanction for committing the new crime. *Cf. United States v. Rodriguez,* 794 F.2d 24, 27 (2d Cir.1986), *rev'd,* 480 U.S. 522, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (defendant informed of mandatory penalty for committing a crime while released on bail). 18

U.S.C. § 3147, as applicable at the time of the electrocobalt burglary,[3] provided:

> A person convicted of an offense committed while released pursuant to this chapter shall be sentenced, in addition to the sentence prescribed for the offense to—
>
> > (1) a term of imprisonment of not less than two years and not more than ten years if the offense is a felony; or
> >
> > (2) a term of imprisonment of not less than ninety days and not more than one year if the offense is a misdemeanor.
>
> A term of imprisonment imposed pursuant to this section shall be consecutive to any other sentence of imprisonment.

The Bail Reform Act requires that persons released[4] not commit a crime, 18 U.S.C. § 3142(C)(1)(A), and that conditions of release be specifically set forth so as to guide these persons' conduct during release, 18 U.S.C. § 3142(h)(1). The Act also provides that the releasing judge "shall" advise the person of "the penalties for violating a condition of release, including the penalties for committing an offense while on pretrial release." 18 U.S.C. § 3142(h)(2)(A).[5] Section 3142 does not specify the effect of failing to give this notice on the court's ability to impose a sentence under § 3147.

We agree with the Fourth Circuit's decision in *United States v. Cooper,* 827 F.2d 991 (4th Cir.1987) that the Bail Reform Act itself precludes the sentencing under § 3147 of a person who was not advised at the time of release of the penalties for committing an offense while released on

---

3. Section 3147 was amended in 1986 to eliminate the two year and ninety day minimum sentences.

4. 18 U.S.C. § 3142 speaks in terms of *pre-trial* release. However, 18 U.S.C. § 3141(b) makes the release and detention provisions of the Bail Reform Act applicable to those persons awaiting an appeal of conviction or sentence.

5. (h) Contents of release order.—In a release order issued pursuant to the provisions of subsection (b) or (c), the judicial officer shall—

(1) include a written statement that sets forth all the conditions to which the release is subject, in a manner sufficiently clear and specific to serve as a guide for the person's conduct; and

(2) advise the person of—

(A) the penalties for violating a condition of release, including the penalties for committing an offense while on pretrial release;

(B) the consequences of violating a condition of release, including the immediate issuance of a warrant for the person's arrest; and

(C) the provisions of sections 1503 of this title (relating to intimidation of witnesses, jurors, and officers of the court), 1510 (relating to obstruction of criminal investigations), 1512 (tampering with a witness, victim, or an informant), and 1513 (retaliating against a witness, victim, or an informant).

18 U.S.C. § 3142(h).

bond. We therefore do not address arguments that retroactive application of § 3147 violates the ex post facto clause [6] or that lack of notice violates the due process clause.[7]

Neither § 3147 nor § 3142 indicate whether providing the required notice under § 3142 is a prerequisite to imposing the enhanced penalty under § 3147. As *Cooper* discussed, § 3147 is based on the Washington, D.C. Release and Detention statute, which provided that informing released persons of the penalties for committing a crime while on release was merely advisory. *Cooper*, 827 F.2d at 994. Congress dropped this provision of the D.C. statute when drafting the Bail Reform Act. The legislative history of the Act indicates that the other warnings provided for in § 3142, regarding the penalties for bail-jumping (§ 3146) and witness, victim or informant tampering (18 U.S.C. §§ 1503, 1510, 1512, 1513), were to be advisory only. *Id.;* S.Rep. No. 225, 98th Cong., 2d Sess. at 25 (1984), *reprinted in* 1984 U.S. Code Cong. & Admin.News 3182, 3208. There is no such reference to the effect of a failure to warn about a § 3147 enhanced sentence. Accordingly, we will not hold that Congress' "omission to make [§ 3142(h)(2)(A)] warnings advisory for § 3147 was ... a result of oversight." *Cooper*, 827 F.2d at 994. Witness tampering and obstruction of criminal investigations are crimes whose punishment does not depend on a person's custody status. As to the § 3146 penalties for failure to appear, Congress may have determined that no criminal, regardless of a failure to give notice, should be allowed to violate conditions of release and face only the sanction of bond revocation. We need not engage in such speculation, however, because we are instructed to apply the rule of lenity in interpreting ambiguous penal statutes. *Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955).

DiCaro was not informed at the time of his release that he was subject to an additional, mandatory prison term [8] if he committed a crime while on release. In the absence of any congressional indication that failure to give this warning carries no consequence, we will not assume that § 3142(h)(2)(A) is superfluous.

### V.

In summary, we affirm DiCaro's convictions on the conspiracy and interstate transportation counts, and vacate his sentences under § 3147.

---

**6.** *See United States v. Patterson*, 820 F.2d 1524 (9th Cir.1987) (no ex post facto violation in applying § 3147 on similar facts); *United States v. Molt*, 758 F.2d 1198, 1200–01 (7th Cir.1985), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 715 (1986) (finding an insufficient showing that retroactive application of 18 U.S.C. § 3143—the new, stricter standard for granting release—worked an increase in punishment, and noting that "courts are much more critical of slight increases in formal punishment than of substantial shifts in the balance of procedural advantage...."); *United States v. Mitchell*, 600 F.Supp. 164 (N.D.Cal.1985) (Bail Reform Act cannot be applied retroactively).

**7.** We also do not reach the issue of whether § 3147 creates a separate crime. *See United*

*States v. Feldhacker*, 849 F.2d 293 (8th Cir.1988) (section 3147 is a sentence enhancement provision, not a separate crime); *Patterson*, 820 F.2d 1524 (same); *Rodriguez*, 794 F.2d 24 (2d Cir. 1986), *rev'd on other grounds*, 480 U.S. 522, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (same). *Cf. United States v. Davis*, 801 F.2d 754 (5th Cir. 1986) (Section 1202(a)—providing an enhanced sentence for felons in possession of a firearm— is a separate crime).

**8.** *See Rodriguez v. United States*, 480 U.S. 522, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (allowing the district court to grant probation notwithstanding the requirement of § 3147 that a "term of imprisonment" be imposed).