**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Reuben STURMAN, Defendant–Appellant.**

No. 94–2527.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 4, 1995.

Decided March 14, 1995.

Barry Rand Elden, Asst. U.S. Atty., Patrick King (argued), Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Adam Bourgeois, Bourgeois & Edwards, Chicago, IL (argued), for defendant-appellant.

Before BAUER, and MANION, Circuit Judges, and MILLER, District Judge.*

BAUER, Circuit Judge.

Reuben Sturman was convicted of conspiracy to commit extortion, attempted extortion, and travel in interstate commerce for the purposes of committing extortion. 18 U.S.C. §§ 1951, 1952. He contends on appeal that the trial court proceeding was fraught with error and asks, on that basis, that we reverse his conviction or at least vacate portions of his sentence. We find his arguments unpersuasive, and so we affirm.

## I.

From his home state of California, Reuben Sturman operated a nationwide wholesale and retail adult entertainment business for over thirty years. His power and influence was such that many in the industry believed that he *was* the industry. Sturman had substantial control over distribution of adult videos and magazines and marital aids. A significant portion of his income came from small operators located throughout the United States, who paid Sturman for supplies or services in organizing and running local enterprises. Sturman's fiery relationship with operators in Phoenix, Cleveland, and Chicago led to the prosecution of this case.

---

* The Honorable Robert L. Miller, Jr., United States District Judge for the Northern District of Indiana, is sitting by designation.

Tamara Green took over the ownership and operation of the Book Cellar, a chain of several adult book stores in Phoenix, Arizona, after her husband, Howard, the store's previous owner, passed away in 1990. The Book Cellar leased peep show video equipment from Sturman. Soon after taking over the business, Green learned that, for several months, her husband had been paying Sturman twice the amount called for in the lease agreement. Green instructed her accountant to suspend all payments until October of 1991 when the accumulated credit would be exhausted and at which point they could resume payment at the contract rate.

Sturman was not particularly pleased with Green's decision. On several occasions in the fall of 1991, Sturman told Green's accountant and general manager that unless Green paid him the additional money, he would "send her a message." In November of 1991, Herbert Feinberg, an employee of Sturman's, asked Kevin Beechum to hire some people "to smash a bookstore in Phoenix, Arizona." Beechum hired Jay Brisette, Donald Mares, and Paul Mahn and instructed them to vandalize one of Green's stores because she wasn't paying the money which she owed. On December 21, 1991, Brisette, Mares, and Mahn entered Green's store with hammers and baseball bats and proceeded to cause approximately $10,000 in property damage. Convinced that this was Sturman's "message," Green resumed paying Sturman at a monthly rate twice that of the agreement. Sturman's secretary testified that when she asked Sturman why Green had resumed paying the higher rate, he replied, "I sent her a message and she understood."

Mel Kamins had been associated with Sturman since 1955. In 1986, Kamins purchased several Cleveland adult entertainment businesses from Sturman. His agreement with Sturman required Kamins to make monthly payments ranging between $60,000 and $90,000 for ten years to Sturman or Sturman's nominees.

In the meantime, the IRS had discovered that Sturman was significantly delinquent on his prior tax obligations. Consequently, the IRS served upon Kamins and others owing obligations to Sturman, tax levies directing those persons to pay directly to the IRS any money owed to Sturman.

After Kamins began complying with the levy, Sturman contacted Kamins in an effort to persuade him to ignore the levy and continue the payments. Alternatively, Sturman urged Kamins to skim his profits and pay Sturman in cash. Kamins refused.

Sturman proceeded to hire a man named James Long to investigate the level of security at Kamins's stores. Long had performed security-oriented work for Sturman in the past. Sturman told Long that Kamins had not been paying Sturman what he owed. Later that month (February 1992), Sturman and Long visited Kamins's store. When Kamins again insisted on honoring the IRS levy, Sturman wrote Kamins a note which read, "You are going to get a message." Though nothing ever was done to Kamins or his business, Feinberg did discuss with Kevin Beechum the possibility of hiring Beechum's men to do a few more jobs in Cleveland. It appears as if the only thing that saved Kamins from a fate similar to that of Green were the developments taking place in Chicago.

Roy May and his wife, Paula, owned and operated several adult entertainment businesses in Chicago. They had an arrangement with Sturman that entitled Sturman to a certain percentage of the profits received from their peep show receipts. Under this arrangement, the Mays typically delivered to one of Sturman's nominees a cash payment ranging from $60,000 to $100,000 every four to six weeks. This portion of the Mays' revenues was never reported to the IRS. Sturman frequently demanded that in addition to the payments, the Mays give him title to half of their real estate holdings, the purchase of which Sturman had absolutely nothing to do with. Understandably, the Mays refused these demands.

In 1987, Paula May was indicted for tax evasion. Subsequently, Roy May ceased making the payments to Sturman. Sturman then suggested that May pay Sturman the money through a consulting arrangement. Although he received no benefit from this arrangement, May consented to the deal for

fear that if he did not, Sturman would ruin him financially. During the term of the consulting contract, May resumed his profit-skimming cash payments to Sturman, albeit at a lower rate.

In 1988, Roy May refused to renew the consulting contract. Again, however, his fear of what Sturman might do to him and his business caused him to agree to pay Sturman $3.7 million for the rights to show adult films produced by Sturman's new company, Wild Man Films Inc., despite knowing that these films were worth no more than $200,000. May never used these films.

When the IRS began sending tax levies to Sturman's various debtors, Sturman suggested that he and May cancel their Wild Man Films contract so that May would have nothing to pay to the IRS. They did so but soon thereafter, Sturman began pressuring May to resume paying him. Sturman asked May to start making payments to a company named Video Views, which Sturman insisted could not be traced to Sturman. Reluctant to violate the IRS levy, May refused.

In the spring of 1992, Feinberg once again hired Brisette and his men, this time for a job in Chicago. After the financial arrangements were completed, Brisette and three others, Donald Mares, Paul Mahn, and Joseph Martinez, flew to Chicago. They intended to plant several remote-controlled bombs at eight of May's Chicago stores. After successfully planting a bomb at the first site, Mares and Mahn were travelling to a store on Wells Street when one of their bombs detonated in their car at the intersection of Dearborn and Division streets. Mahn fled the scene. Mares died as a result of injuries sustained in the explosion.

After hearing about the explosion, Brisette and Martinez aborted their efforts and together with Mahn, returned to Los Angeles. From there, the plan continued to unravel.

Still panicked from what had happened in Chicago, Brisette began to cooperate with the FBI. As part of his cooperation, Brisette participated in a tape-recorded conversation with Feinberg. The FBI then approached Feinberg and asked him to cooperate in a case against Sturman. Feinberg refused and then went to meet with Russell Hampshire, another figure in the California adult entertainment industry and a friend of Sturman's. In his conversation with Hampshire, Feinberg stated that he had been hired by Sturman to damage some stores in Chicago and that one of the people involved was killed. Feinberg asked Hampshire to assure Sturman that Feinberg would not cooperate with the police as long as Sturman helped him with his legal fees. When Hampshire passed on Feinberg's message, Sturman told Hampshire that he would take care of Feinberg's legal fees. A few months later, Sturman transferred $25,000 from his account to an account held by Feinberg's attorney.

Sturman and Feinberg were indicted together but tried separately. Sturman was convicted on Counts One, Seven, and Eight of a ten-count indictment. Count One charged Sturman and Feinberg with conspiring to commit extortion with respect to Green, Kamins, and the Mays. 18 U.S.C. § 1951. Count Seven charged Sturman and Feinberg with an attempt to commit extortion in connection with their threats to the Mays between November of 1991 and November 1992. *Id.* Count Eight charged Sturman and Feinberg with causing persons to travel in interstate commerce for the purpose of promoting extortion. 18 U.S.C. § 1952. Sturman was acquitted of the remaining charges. The court sentenced Sturman to 235 months in prison and imposed a two-year term of supervised release. Sturman appeals his conviction and his sentence.

## II.

Sturman proffers several challenges to both his conviction and his subsequent sentence. We consider each challenge in turn.

### A. Sufficiency of the Evidence

■ Sturman challenges the sufficiency of the evidence supporting his conspiracy conviction and his two nonconspiracy convictions. Prefacing our discussion is a recap of the standard of review in sufficiency claims. A defendant seeking to have a conviction reversed must show that even after looking at the evidence in a light most favorable to the government, no rational trier of fact

could have found the essential elements of a crime beyond a reasonable doubt. *United States v. Tylkowski,* 9 F.3d 1255, 1259 (7th Cir.1993).

■ The essential elements of the crime of conspiracy are, first, an agreement to achieve an illegal purpose, and second, the defendant's participation in the agreement. *United States v. Edwards,* 36 F.3d 639, 643 (7th Cir.1994). Evidence of an agreement must be substantial, *id.,* and the defendant's participation must be proved with evidence of the defendant's own words and actions. *United States v. Martinez de Ortiz,* 907 F.2d 629 (7th Cir.1990) (*en banc*), *cert. denied,* 498 U.S. 1029, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991).

■ Sturman contends that his conspiracy conviction merits reversal because there is no evidence of either a criminal agreement or his participation in such an agreement. He claims that the only evidence connecting Sturman to the acts of Beechum, Brisette and the other vandals was Hampshire's trial testimony about his conversation with Feinberg; testimony Sturman claims to be inadmissible because it was double hearsay and insufficient because statements of a coconspirator alone cannot support a conviction for conspiracy.

We begin by evaluating the admissibility of Hampshire's testimony. Insofar as Sturman contests the admission through Hampshire of any instructions which he gave to Feinberg, his claim is unavailing. Anything said by Sturman out of court is admissible as a statement of a party-opponent. Fed.R.Evid. 801(d)(2). In other words, had Feinberg testified as to what Sturman told him, it would have been admissible. The next layer of statements, Feinberg's relaying to Hampshire what Sturman instructed him to do, is admissible because as a statement of a coconspirator, it is not hearsay. *Id.* Anything said by one conspirator within the scope of the conspiracy is attributed to the other conspirators. It is this layer of statements which Sturman challenges.

Asserting that the evidence failed to establish that he entered into an agreement with Feinberg, Sturman concludes that the coconspirator provision of Rule 801(d) does not apply. Accepting Sturman's claim would require that we ignore a substantial portion of the government's case. Sturman had financial disputes with each of the three persons named as victims in the indictment. He also threatened each of those victims on several occasions. When the threats failed to effect payment, two of the three victims' stores were the targets of serious vandalism attacks. Testimony from Kevin Beechum suggests that an attack against the third victim, Mel Kamins, was in the works. James Long's testimony corroborates this and indicates further that Sturman was behind the plan.

The jury also heard incriminating admissions made by Sturman as to his role in the attacks on Green and May. Sturman's secretary, Stephanie Friedman, testified that when informed that Green had resumed paying double her rental fee, Sturman replied that he had sent Green a message and that she had understood. In his brief, Sturman concedes that the evidence above suggests that Sturman may have been connected to the Phoenix vandalism but that "it also supports the conclusion that Sturman took advantage of a situation with which he had no connection." We view the evidence in a light most favorable to the government and in such a light, as Sturman acknowledges, the evidence supports an inference of an agreement.

Furthermore, Naomi Delgado, Sturman's former wife, testified that after Roy May had refused to pay him, Sturman had talked of breaking May's son's legs and of blowing up his house. Delgado also testified about a conversation she had with Sturman in April 1992, just after Feinberg had met with Sturman. Sturman said that Feinberg had hired some men to remedy the situation with May by damaging some of May's stores, but that the plan had gone awry and one of the men had died. Sturman also assured Delgado that the crimes could not be traced back to him and that Feinberg was willing to go to jail for Sturman as long as Sturman paid his legal fees and took care of his family.

Viewed in a light most favorable to the government, the evidence above provided

ample support for the conclusion that Sturman entered into an illegal agreement with Feinberg. Moreover, the jury could have interpreted the evidence to base his conviction on any one of the three charged instances of extortion. In each case, there was evidence that Sturman made threats in an attempt to elicit payments from the three victims. And in each case, there was evidence that Brisette and his men discussed with Sturman's employee, Feinberg, vandalizing the properties of the same three persons with whom Sturman had financial disputes. When they asked why they were hired to commit these acts, they were consistently told that it was because the victims refused to pay the money they owed. Since the only evidence of any financial obligations owed by Green, Kamins, and May was each of their disputes with Sturman, it was reasonable for the jury to infer that these acts were done in an effort to obtain those payments; an inference supported further by Sturman's comments to Friedman and Delgado after the incidents in Phoenix and Chicago, respectively. The jury could also have concluded from Sturman's agreement to pay Feinberg's legal fees that the attempted cover-up of Sturman's involvement was part of the overall conspiracy. Simply put, the evidence of Sturman's participation in an agreement with Feinberg was ample, and we conclude, therefore, that admission of Feinberg's out-of-court statements through Hampshire's testimony was proper.

Sturman argues that even if Hampshire's testimony survives hearsay analysis, it remains the basis for a reversal because coconspirator statements should not be the sole basis for a conspiracy conviction. Sturman correctly notes that we have left open the question of whether coconspirator testimony alone can support a conspiracy conviction, *United States v. Martinez de Ortiz*, 907 F.2d 629, 632 (7th Cir.1990) (*en banc*), *cert. denied*, 498 U.S. 1029, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991), and he invites us to

resolve the matter here. We need not do so; Sturman's premise, that his conspiracy conviction rested solely on Feinberg's statements to Hampshire, is faulty. As detailed above, the evidence apart from Hampshire's testimony was sufficient to support Sturman's conspiracy conviction.

Sturman alleges that his two remaining convictions also merit reversal. Count Seven charged Sturman and Feinberg with the attempted extortion of Roy May. 18 U.S.C. § 1951.[1] Count Eight charged Sturman and Feinberg with causing Brisette, Mares, and Mahn, to travel interstate for the purposes of facilitating the extortion of Roy May. 18 U.S.C. § 1952.[2] Sturman offers two reasons for reversing these convictions. The first, that his extortion convictions were based on inadmissible coconspirator testimony, is rebutted by our conclusion above that Hampshire's testimony was admissible.

■ Sturman's second argument is that the government failed to prove beyond a reasonable doubt the element of "fear" as required in an extortion case. He claims that the evidence offered to prove that May acted under fear of economic harm was insufficient to support an extortion-based conviction.

■ Fear of economic harm is an acceptable form of fear under section 1951. *United States v. Crockett*, 979 F.2d 1204, 1212 (7th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993). Sturman argues that the evidence failed to show that May was intimidated by Sturman's threats. Citing testimony showing that May resisted Sturman's attempts to obtain May's real estate and that May refused to pay Sturman $10 million for the Wild Man films, Sturman claims that there is substantial evidence proving that May was not afraid of him.

Sturman's view of the evidence is one-sided. May consistently entered into agreements with Sturman in which he would pay Sturman a sizable amount of cash. Though

---

1. 18 U.S.C. § 1951(b) defines extortion as, "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

2. 18 U.S.C. § 1952 makes it unlawful to travel in interstate commerce or to use a facility of interstate commerce with the intent to "commit any crime of violence to further any unlawful activity."

these payments varied in their purported form, the constant in each instance was that the payments bore no rational relation to any service provided by Sturman. May's token resistance to some of Sturman's more outrageous demands hardly obscures the several financial deals so patently contrary to May's interests, they can only be explained as extortionate. The history of Sturman's financial demands on May convincingly support May's sworn testimony stating that he was fearful that if he did not comply, Sturman would cause him financial ruin.

### B. Polling the Jury

 Sturman's next proffered basis for reversal requires some discussion of the events which transpired at the conclusion of the trial. After the jury delivered its verdict, the court, at Sturman's request, polled the jury. Assured that the jury was unanimous in its guilty verdicts, Sturman nevertheless asked that the court poll the jury on each of the three extortion schemes charged in the conspiracy count to ensure that the jury had been unanimous as to at least one of the three alleged conspiracies. The court refused this request. Sturman claims that the court's refusal constitutes reversible error. Because Sturman is contesting the manner in which the jury was polled, a matter left to the discretion of the trial judge, *United States v. Shepherd,* 576 F.2d 719, 722 n. 1 (7th Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978), we review the record for an abuse of that discretion.

Though he readily concedes that no court has held that a defendant has a right to poll the jury in the manner he desires, Sturman maintains that the right follows logically from two separate lines of authority: the right to poll the jury and the right to have a specific unanimity instruction. A specific unanimity instruction advises the jury that where a charged offense can be predicated on one of several charged acts, the jury must be unanimous on the act before it can convict. *United States v. Beros,* 833 F.2d 455, 462 (3d Cir.1987); *United States v. Mangieri,* 694 F.2d 1270, 1280 (D.C.Cir.1982). It is not enough that the jury is unanimous as to guilt but divided "in their assessment of

which act supported the verdict." *Beros,* 833 F.2d at 462. Sturman contends that it logically follows from this proposition that the right to poll the jury should extend to polling on each individual scheme.

 The right to poll a jury is indeed a substantial right, but it is not a constitutional right. *United States v. Randle,* 966 F.2d 1209, 1214 (7th Cir.1992). The purpose of the jury poll is to ensure unanimity by forcing the jurors to voice their accountability. *Shepherd,* 576 F.2d at 725. It is not intended to develop into a searching inquiry into the factual bases underlying the verdict. Sturman's proposal seeks to change this.

The court specifically instructed the jury that in order to convict Sturman on the conspiracy charge, they were to be unanimous not only in their conclusion of guilt but on their findings underlying that conclusion. There is nothing in the record to rebut our standard presumption that jurors follow their instructions. *United States v. L'Allier,* 838 F.2d 234, 242 (7th Cir.1988). Were we to accept Sturman's argument, we would be in effect holding that trial courts should use the jury poll as a reinforcement against potentially misleading instructions. And nothing Sturman proposes suggests any limits as to what purpose the jury poll could be used. Indeed, his position seems to be that whatever aspect of the case the defendant deems to be confusing to the jury would be ripe for polling. Such a requirement would be clearly excessive.

Moreover, not only is there no evidence to suggest the jury was confused about the unanimity instruction, but there is evidence indicating that the jury was in fact unanimous in its finding that the conspiracy against May was complete. Necessary to its conclusion that Sturman was guilty on Counts Seven and Eight of the indictment was a factual finding that Sturman hired Feinberg to organize an attack on May's stores in an effort to coerce May into resuming his payments to Sturman. In other words, for the jury to have found Sturman guilty beyond a reasonable doubt on Counts Seven and Eight, they had to have found that Sturman and Feinberg had an agreement because there was no evidence showing that

Sturman ever interacted with Brisette and the others who travelled to Chicago. Only Feinberg had contact with those men. Hence, implicit in the jury's guilty verdict on the nonconspiracy charges was a unanimous finding as to his participation in an agreement to extort the Mays.

### C. Sentencing

 Sturman contests the application to his case of several provisions of the United States Sentencing Guidelines ("Guidelines"), each of which resulted in increases to his sentencing level. We limit our discussion to an analysis of his enhancement for being convicted while on bond for a previous offense and to the seven-level increase imposed because of the size of the extortionate demands involved. Sturman's other challenges do not merit discussion and are affirmed without comment.

When charged and subsequently convicted in this case, Sturman was on release pending trial in a tax evasion case in Cleveland and a RICO case in Las Vegas. Upon his release from those two arrests, Sturman was advised that the penalty for committing a felony while he was still on bond was an increase in the term of imprisonment from anywhere between two and ten years. After his release, the Guidelines were adopted and the statute amended such that the minimum term was to be set by the Guidelines. The ten-year maximum term remained intact. In Sturman's case, the Guideline-mandated minimum rose to sixty-seven months.

Sturman does not quarrel with the court's application of the evidently clear language of these provisions. Rather, he maintains that the court's violation of 21 U.S.C. § 3142(h)(2)(A), which provides that a defendant shall be informed as to "the penalties for violating a condition of release," precludes application of the increase in this case. Specifically, he argues that amendment of 18 U.S.C. § 3147 and adoption of the Guidelines resulted in an increase in penalties so severe that it was the releasing courts' duty to inform him of the change. The failure to do so, Sturman concludes, thwarts any attempt to punish him for violating his release status.

We have indeed held that the failure to adequately apprise a defendant released on bond of the penalties he will face if convicted of a felony during that period is a precondition to an enhancement under section 2J1.7 of the Guidelines. *United States v. DiCaro*, 852 F.2d 259, 264–65 (7th Cir.1988). The issue here then is whether the notice Sturman received was adequate.

In support of his claim that the notice provided to him by the releasing judges in Cleveland and Las Vegas was inadequate, Sturman cites *United States v. DiCaro*, 852 F.2d 259 (7th Cir.1988) and *United States v. Onick*, 889 F.2d 1425 (5th Cir.1989). Neither case provides persuasive authority for his position. The defendants in both cases had been released on bond prior to enactment of 18 U.S.C. § 3147 and had not been told that commission of a felony while on bond for a previous offense could lead to *any* enhancement of their sentences. Both were convicted for subsequent offenses and received enhancements under the just-enacted 18 U.S.C. § 3147. The respective courts of appeals vacated those enhancements because the defendants had received no notice that enhancement was a possibility.

Sturman's case is easily distinguished. The courts in Cleveland and Las Vegas specifically informed him that a felony conviction while on bond could result in his sentence being increased from anywhere between two and ten years. The subsequent amendment did not cause this information to become false. It simply narrowed the sentencing judge's discretion in this area. The releasing courts could not be expected to estimate exactly how the subsequent judge would exercise that discretion. In our view, the notice provided to Sturman in this case, correct in its warning and accurate in its assessment of the maximum amount of jail time he could receive for a subsequent conviction, was legally adequate.

 In extortion cases, the Guidelines require that certain adjustments be made to the defendant's offense level based on the amount demanded. U.S.S.G. § 2B3.2. Sturman contests the district court's calculation of this amount in arriving at its sentencing

determination for the conspiracy counts.[3] The court concluded that the extortionate demands made of Green, Kamins, and May amounted to $191,000, $5.7 million, and $3.75 million, respectively. The court arrived at these amounts by averaging the payments each victim had been making and extrapolating them over a specific time period. In each case, the victims had been making periodic payments consensually and then had ceased. Green halted the payments when she took over the business from her husband and realized that he had been paying Sturman twice as much as provided in the agreement. Kamins and May stopped paying when the IRS issued levies against them. In each case, the court found that the extortion began when Sturman resorted to threats in an effort to have each victim resume payment. The court calculated the values of the extortion by multiplying each victim's average payment by the time period which Sturman indicated was remaining on each victim's obligation. Sturman takes issue with the court's underlying findings as well as its calculation method.

█ Sturman claims first that no adjustment should have been made for the amount of loss because the victims' debts were legitimate. This argument misses the mark. As the government points out, in an extortion case, a defendant's claim of right to the property is irrelevant. One may be found guilty of extortion even for obtaining one's own property. *United States v. Castor*, 937 F.2d 293, 299 (7th Cir.1991). Hence, once Sturman had been convicted of conspiring to commit extortion, it was perfectly reasonable for the court to augment Sturman's sentence to account for the size of the extortionate demand.

█ Sturman's next contention is that the methodology used to compute the size of the extortionate demand was improper. He maintains that the court's use of an average payment and extrapolation failed to consider

the possibility that the profits-based payments might fall.

Application Note 3 to section 2B1.1 states:

For purposes of [calculating loss], the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based upon the approximate number of victims and the average loss to each victim, or on more general factors such as the scope and duration of the offense.

U.S.S.G. § 2B1.1, application note 3. The language of this note clearly allows for a court to use estimates in computing the size of the extortionate demand. Similar language in the application notes following the Guidelines' treatment of drug offenses permits sentencing courts to "approximate the quantity of the controlled substance," U.S.S.G. § 2D1.1, a practice we have approved when the approximation is based on the evidence. *United States v. Mumford*, 25 F.3d 461, 467 (7th Cir.1994).

There was, however, no evidence that the payments made by any of the victims would fall below the amounts used to calculate the average. Though the possibility of intervening events which might cause the payments to fall is always present, in the absence of evidence suggesting such occurrences, it would be inappropriate (not to mention supremely difficult) for the sentencing judge to account for such occurrences. For the district court to valuate the extortionate demand using evidence of prior practice and projecting it over the time period suggested by Sturman himself, was, therefore, a permissible means of estimation.

### III.

Despite his assertions to the contrary, we find no reason to overturn the jury's verdict or to disturb the district court's sentencing

---

3. Calculations of the offense level in a conspiracy are determined using the level applicable to the substantive offense which in this case is Extortion by Force or Threat of Injury or Serious Damage. U.S.S.G. § 2X1.1. Also, where a conspiracy contains several substantive offenses, computations are done as if the defendant had been convicted on a separate count of conspiracy for each offense. U.S.S.G. § 1B1.2. Sturman's sentence under Count One, therefore, was calculated separately for each of the three victims.

determination. For all of the foregoing, Sturman's conviction and sentence are

AFFIRMED.