Max Wayne WATKINS, Petitioner,

v.

UNITED STATES of America, Respondent.

No. 11–cv–3021.

United States District Court, C.D. Illinois, Springfield Division.

Aug. 16, 2012.

Max Wayne Watkins, Pekin, IL, pro se.

Asst. U.S. Atty. Gregory K. Harris, U.S. Attorney's Office, Springfield, IL, for Respondent.

## ORDER

### Challenging Conviction and Sentence in Case No. 08–cr–30070

RICHARD MILLS, District Judge.

Max Wayne Watkins was a car salesman who tried to get $1,203, 972.91 in bad checks past two check verification services.

The Government offered 33 months.

Against the advice of appointed counsel, he rejected the deal.

He gambled.

He lost.

He now seeks relief under 28 U.S.C. § 2255.

Motion denied.

### I.

### A.

Prior to being convicted of two counts of wire fraud in Case No. 08–cr–30070, Watkins had accumulated several convictions for crimes of dishonesty.

In 1962, he pled guilty to a forgery charge before a Special Court Martial of the United States Marine Corps, for alter-

ing two checks. In 1975, Watkins was convicted of concealing mortgaged property in state court in Missouri, for concealing four appliances that were subject to a security agreement. In 1991, he plead guilty to grand theft of property in state court in California, for failing to deliver leased vehicles after accepting the down payments for the vehicles.

On November 5, 1999, Watkins pled guilty in the Southern District of Illinois to conspiring to utter or possess counterfeit securities, uttering or possessing counterfeit securities, and conspiracy to commit money laundering relating to a scheme involving counterfeit cashiers' checks. On the same occasion, he also pled guilty in the same court to committing mail fraud in the Eastern District of Missouri,[1] relating to a scheme to obtain money and property under false pretenses from Chrysler Financial Corporation and two other financial institutions.

### B.

In August 2006, Watkins obtained employment as a salesman at Victory Lane Ford, Litchfield, Illinois. Upon his arrival, he immediately began a scheme that has been described as follows:

> Watkins was a salesman at a car dealership and ran a scam that increased his sales and thus his commissions. He increased his sales by targeting unsophisticated buyers whose credit rating should have precluded them from qualifying for financing. In order to get approval for a credit sale, Watkins obtained a signed personal check from the buyer with the amount left blank. Sometimes he told the buyer that he would fill in the necessary amount, while other times he said he would not process the check and that he just needed it for

credit verification. Watkins would then complete the check for a large figure to cover the sales price or a significant down payment, knowing there were insufficient funds in the account, and run the check through one of two services that verify and guarantee checks and process payments. If the check service did not approve the check, Watkins would resubmit the check at a later date, sometimes modifying the name or amount or identification of the account holder, in the hope of it slipping by and getting approved. After Watkins obtained approval, he would transfer ownership and allow the buyer to depart with the vehicle. Watkins told the buyer to arrange payment of any outstanding balance with the check service if contacted by the service. This was the scheme in general, although it was executed with minor variations. Eventually the check services, which were on the hook for the financing, realized that the checks were bouncing, and one of the services alerted the authorities.

*United States v. Watkins,* 393 Fed.Appx. 392, 393 (7th Cir.2010). In early October 2006, Watkins was told by the owner of the dealership that he could not sell any more cars or receive his commission until the suspicious deals were sorted out. As a result, Watkins resigned.

### C.

A special agent of the U.S. Secret Service began investigating in late October 2006. In November 2006, Watkins found out about the investigation, contacted the agent, and requested a meeting. At the interview held on November 16, 2006, the agent informed Watkins of his *Miranda* rights and Watkins signed a waiver. Wat-

---

1. The case was transferred from the Eastern District of Missouri to the Southern District of Illinois pursuant to a plea agreement.

kins verbally explained his role in the offense. In addition, Watkins provided a written statement, detailing his conduct. Watkins met with the agent again in February 2007, executed a *Miranda* waiver, made verbal statements regarding the offense, and submitted another written statement.

Throughout late 2006 and early 2007, agents conducted numerous interviews with Watkins' customers from the dealership, dealership personnel, and check service employees.

In March 2007, a director of corporate security of the parent company of one of the check services arrived at Watkins' home. Watkins invited him in, and an interview was conducted. During the interview, Watkins was cooperative, expressed remorse, and explained how the offense was committed.

## II.

### A.

On July 1, 2008, a grand jury in the Central District of Illinois charged Watkins with two counts of wire fraud, in violation of 18 U.S.C. § 1343. A summons was issued, and Watkins had his initial appearance before U.S. Magistrate Judge Byron G. Cudmore on April 23, 2008. At that hearing, Judge Cudmore determined that Watkins qualified for appointment of counsel, and appointed an assistant federal public defender to represent Watkins. In addition, Judge Cudmore ordered that Watkins be released on a $10,000 own recognizance bond, with home confinement as a condition of bond.

Discovery materials were tendered, and the trial was continued several times, primarily due to ongoing plea negotiations. Also, the defense had filed a motion in limine, seeking to bar admission of Watkins' 1999 federal convictions for mail fraud, conspiring to utter or possess counterfeit securities, uttering or possessing counterfeit securities, and conspiracy to commit money laundering.

On January 26, 2009, the parties filed a joint motion to continue the trial, which was scheduled to commence on February 3, 2009. The parties stated that Watkins announced his intent to plead guilty on January 9, 2009, but that he changed his mind, and announced on January 22, 2009, that he intended to proceed to trial.

On January 29, 2009, U.S. District Judge Jeanne E. Scott allowed the joint motion and continued the trial to April 2009. On the same date, Judge Scott directed the Clerk of Court to docket a letter from Watkins regarding his dissatisfaction with the public defender.

In the letter, Watkins stated the following:

Dear Judge Scott

I beg the Court to please have the Public Defender ... to withdraw as my attorney. And I beg the Court to appoint me a [new] attorney under CJA. I have been getting a lot of pressure from [the public defender] to plead guilty and take a deal. To do so I feel I would have to lie to the Court and I do not want to do that. I am doing this pro-se because [the public defender] refused to do it for me. I know I will need a continuance to get a new lawyer but I feel this is the only way to get a fair trial and have good representation.

Yours Truly

Max W. Watkins

Judge Scott set the matter for a hearing regarding the status of defense counsel. The hearing was held on February 2, 2009, and the following transpired:

THE COURT: ...

And I set this matter for hearing today after receiving a letter from Mr. Watkins complaining about [the public defender].

So Mr. Watkins, what seems to be the problem?

THE DEFENDANT: Well, as I said in my letter, ma'am, that I just—I don't feel that he's got my best interest at heart. And I don't feel that I would get good representation.

THE COURT: Can you be more specific than that?

THE DEFENDANT: Well, from day one, you know, I've been asked to plea bargain, plea bargain, plea bargain. And I was told I have no chance of winning because of my previous record, which has never been brought up, I guess, so far.

And at one point he even talked me into plea bargaining, and then I read the plea bargain and I would of have to, I feel, lied to the Court if I pled guilty to the way the plea bargain was written.

And I just feel I would like to have an attorney that doesn't—is not as familiar—you know, that I can sit down and talk to and try to explain everything. Every time I try to explain something to [the Public Defender], it was, it doesn't matter, you're going to lose. And I'm tired of hearing it doesn't matter, you're going to lose.

THE COURT: [Public Defender], do you have anything you would like to add.

[PUBLIC DEFENDER]: Well, Your Honor, I think that's a way over-simplification of the reality of the situation.

I have given Mr. Watkins my honest assessment of the evidence in this case. I have told him that his prior conviction will undoubtedly be used to impeach his credibility if he were to elect to testify. And I've also advised him that I believe those prior convictions could be used under 404(b) to show evidence of motive, intent, common scheme, things of that nature. I have reviewed all the evidence. I have told him what my honest assessment was in this case. I have never once tried to force him to plea bargain. I have been very candid with him about what I believe the evidence is.

I have trial notebooks, Your Honor, in this case, prepared before Christmas, when he notified me on December 11th, after weighing his options—his options, he decided that he did not want to plead guilty. And so I began preparing trial notebooks. I informed [the Prosecutor] of that.

What I have here in front of me is just one of the three binders that I have prepared. The other two are actually three inch binders. The discovery materials in this case are very voluminous. They include a written, signed confession by my client. And so I've spent numerous hours preparing this case for trial.

Prior to the holidays, I contacted Mr. Williams and I suggested that we together ASAP so that we could start going through all of the discovery and my trial notebooks.

THE COURT: Mr. Watkins, you mean? You said Mr. Williams, you meant Mr. Watkins?

[PUBLIC DEFENDER]: I'm sorry, Mr. Watkins; so that we could begin preparing for trial. Pre-trial was initially scheduled for today and with trial starting tomorrow.

He came to my office, I believe it was on January 9th, with his wife. We reviewed some of the discovery. He asked to have his wife join us in my office, at which time she read some of the, what I believe to be, more significant portions of the discovery. And

the decision was made on his part and his part alone at that point that he was going to plead guilty.

And so I got [the Prosecutor] on the phone. And I believe we were on speakerphone for awhile. And he agreed that he would draft a plea agreement consistent with what he had previously discussed in the past. And when Mr. Watkins left my office that day he turned and shook my hand and said, you're the best public defender in town; thank you.

And I received a plea agreement from [the Prosecutor], I believe on the 14th of January. I sent it down to Mr. Watkins and contacted him so that we could review it over the phone. And he said well, I'm not going to do it. And couldn't give me any explanation for why he had changed his mind between January 9th and the date I talked to him on the phone.

So if he wants a trial, that's fine. I'm more than happy to try his case. My trial notebooks are prepared. My trial suits will be cleaned and pressed and hanging in my office prior to trial. And there's no reason to appoint another attorney who's going to have to get up to speed in this case. I'll be ready to go on the next trial date, Judge.

THE COURT: Do you have any final comments, Mr. Watkins?

THE DEFENDANT: You know, when we discussed the plea agreement, the amount—restitution. And when I got the plea agreement, it pretty much says that if I keep this plea agreement, I could end up owing up to 600,000 dollars in restitution. I don't owe—I don't feel that—and the dealer according to—the dealer that I worked for is being sued for this money.

If I sign this plea agreement, I admit I took this money, which I didn't take this money. I don't have the money, the dealer has the money. They kept the money. They kept the money. And I just felt that I couldn't stand up to the Court and lie to the Court to say that I did things that they're saying I did.

THE COURT: Okay. Is the amount of restitution the problem, or is there more of a problem than that?

THE DEFENDANT: I would have—there's actually more of a problem. Because I don't want to bring—

THE COURT: Okay.

THE DEFENDANT: I do not want to lie. I would be lying.

THE COURT: Then don't.

THE DEFENDANT: In my heart I would be lying to the Court.

THE COURT: Then go to trial, sir.

THE DEFENDANT: Yes, ma'am.

THE COURT: It's your decision, ultimately, what you do.

THE DEFENDANT: Thank you.

THE COURT: The attorney has an obligation to give you advice based on his experience and knowledge of the case. You don't have to take the advice. Our prisons are full of people who didn't. And you do get a benefit if you plead guilty in this system, because you're getting credit for accepting responsibility for your actions; which may be put in jeopardy by going to trial and losing.

Now, I'm not saying you are going to lose. It's your decision. But this gentleman has a lot of experience, he is a very capable attorney. You don't have to take his advice, but there is no reason to substitute another attorney and kick the trial out for six months to

a year while somebody else gets up to speed on this.

You decide what you want to do. And that's fine, whatever it is. But there are consequences. And the lawyer has an obligation to alert you to them, and the possible risks and possible benefits of every course of action. Which it sounds like he's trying to do. Any you may not like what you're hearing, but reality is often difficult. But in the end, you do what you want to do, sir. And he will be held to a high standard of reputation if you elect to go to trial. But it sounds like he is prepared and ready to do that. And you decide what you really want to do. You tell him and let's go.

But I'm not going to excuse him as your attorney and appoint someone else. There's no reason to do that. There's no reason to think that any other attorney wouldn't suffer the same difficulties in representation.

So the case will proceed on the scheduled date. And we are in recess.

Did you have anything else; the Government?

[Prosecutor]: No, Your Honor.

THE COURT: All right. I'm sorry, your request is denied.

On February 3, 2009, the Government filed a superseding indictment, which corrected and eliminated certain information alleged in the original indictment.

On March 2, 2009, a privately retained attorney entered his appearance on behalf of Watkins, and on the same date the public defender moved to withdraw. On April 2, 2009, 2009 WL 927494, Judge Scott denied Watkins' motion in limine regarding his previous fraud convictions.

### B.

Watkins' jury trial began on June 2, 2009, and concluded on June 5, 2009. A large number of exhibits were admitted at trial, and twenty-seven witnesses testified. Thirteen witnesses were Watkins' customers from the dealership, four witnesses were associated with the car dealership, five witnesses were associated with the check services, and one witness was from a finance company. The Secret Service agent testified, as did the individual who had vouched for Watkins to get the job at the dealership. The defense called two witnesses, who were both car salesmen familiar with using the check services. Watkins elected not to testify at trial.

At trial, detailed testimony was presented regarding Watkins' history at the dealership, including exhaustive testimony regarding his interactions with customers, including soliciting blank checks from customers, teaching customers how to make false pay stubs at the local library, and instructing customers on where and how to obtain checkbooks with high check numbers when opening accounts. Testimony was heard regarding Watkins' hiring, his campaign to get the dealership to use the check services, the deficiencies in the paperwork he turned in to the dealership, and his focus on secrecy (which included soundproofing his office and installing extra locks). Representatives from the check service companies testified regarding their companies' business relationship with the dealership, standard operating procedures, and how the fraud was uncovered. The Secret Service agent's testimony included reading from Watkins' written statements.

After the Government rested, retained counsel moved for a directed verdict, but Judge Scott denied the motion.

On June 5, 2009, the jury returned a verdict of guilty on both wire fraud counts, and a sentencing date was set. Watkins was allowed to remain on bond, but was directed to touch base with the Probation Office before leaving the Courthouse, to make arrangements regarding the prepa-

ration of the presentence investigation report. No post-trial motions were filed.

## C.

A presentence investigation report (PSR) was prepared for the sentencing hearing. The PSR sets out in detail the offense conduct, including specific details of the fraudulent transactions involving specific customers. The PSR stated that the intended loss was over $1,000,000, and Watkins' offense level was enhanced by sixteen points as a result. The PSR outlined how Watkins' actions impacted the car dealership, the check service companies, and an insurance company that paid a claim to the dealership. The PSR also contained information regarding Watkins' restitution obligations in connection with the offense.

The probation officer attached to the PSR detailed spreadsheets provided by the U.S. Attorney's Office detailing loss amounts and restitution.

The PSR contained Watkins' full criminal history, most of which is detailed above. The PSR also contained information regarding Watkins' childhood, growing up in a poor family with a father who was an abusive alcoholic and a gambler. The PSR included information regarding his wife, including some of the challenges she faces, and information regarding his minor stepdaughters, who he adopted.

Detailed information regarding Watkins' physical, mental, and emotional health were included in the PSR. The PSR also outlined substance abuse information. It also contained his educational and employment information and information regarding his financial situation.

The probation officer determined that the guideline sentencing range was 57–71 months. The probation officer noted that this was Watkins' third federal conviction for financial crimes, and that an above-guidelines sentence could be warranted.

Prior to the hearing, Watkins lodged several objections to the PSR. Watkins argued that the intended loss amount ($1,203,972.91) was improperly calculated, and that, as a result, the offense level tied to the loss amount was too high.

Both parties filed sentencing commentaries before the sentencing hearing. The prosecutor addressed both Watkins' arguments regarding the loss amount and his history of recidivism relating to financial fraud crimes. The prosecutor recommended a sentence at the high end of the applicable guideline range. Watkins' retained counsel addressed Watkins' difficult childhood, his wife's challenges that impact her employability, and Watkins' health issues. Counsel for Watkins argued the following:

> As set forth in 18 U.S.C. Section 3553, the above factors, in combination with others, are to be considered by this Court when fashioning a sentence for defendant. It is defendant's position that the above factors may warrant a sentence [below] the advisory guideline range of 57–71 months. Defendant's age, family circumstances, medical conditions, and difficult upbringing calls into question as to whether a guideline sentence is a sentence that is more than necessary to promote respect for the law, protection of the public, and to prevent further crimes by this defendant. It is defendant's position that a sentence of 36 months is sufficient to meet these objectives.

Counsel went on to address issues related to the loss amount.

Watkins' sentencing hearing was held on December 22, 2009. At the sentencing hearing, the only objections related to the loss amount and Watkins' formal objection to the factual recitation (due to Watkins' claim of innocence). Judge Scott made the

following inquiries at the beginning of the hearing:

THE COURT: All right. Mr. Watkins, do you have a copy of the revised Pre–Sentence Report?

MR. WATKINS: Yes, ma'am.

THE COURT: Have you read it and discussed it with your attorney?

MR. WATKINS: Yes, ma'am.

THE COURT: Is there anything else in addition to what he raised that you want to object to?

MR. WATKINS: No, ma'am.

Counsel for Watkins made his argument regarding the intended loss amount. Judge Scott overruled the objection, and adopted the PSR.

Judge Scott noted that the Court had received a number of letters on Watkins' behalf, and stated that they had been read and considered. (Letters were received from Watkins' mother, his wife, his daughters, his brothers, a sister, two sisters-in-law, his pastor, neighbors, and several friends.)

The prosecutor addressed the issues raised in Watkins' sentencing commentary, acknowledging Watkins' difficult childhood, but noting that Watkins was 63 at the time of the offense, and that he was well into adulthood when he committed most of his other other financial crimes. The prosecutor noted the challenges Watkins' wife faced regarding employment, but stated that he believed that Watkins would continue to receive Social Security retirement benefits while incarcerated. The prosecutor argued that Watkins' health issues were not very severe.

The prosecutor argued that Watkins' criminal history was understated, and that as result he should be classified in the next highest criminal history category. The prosecutor recommended a sentence of 75 months imprisonment.

Counsel for Watkins argued that Watkins' impoverished childhood may have influenced his decision to commit financial crimes as an adult. Counsel reiterated Watkins' age, his health concerns, and the challenges Watkins' wife would have in his absence. Finally, counsel argued that Watkins' older convictions should not be used to increase the criminal history category.

Judge Scott offered Watkins his right of allocution. Watkins stated that the prosecutor was incorrect regarding his Social Security retirement benefits. Watkins said that he had visited the Social Security office, and had been told his benefits would not be paid during his term of incarceration.

Judge Scott stated the following upon imposition of sentence:

All right. I've reviewed of course, the case file. I presided at the trial. I recall the evidence. I've reviewed the Pre–Sentence Report and the letters that were submitted and the memoranda from counsel. And I consider as well the arguments presented.

[Counsel for Watkins] has argued that the Government's recommendation is too severe and not needed to deter the defendant from such conduct. But I must say in reading through the criminal history I wonder what it is going to take to deter the defendant from this kind of conduct.

This is the second round of federal court convictions for this kind of activity, and there is a state conviction further back in his history where he was working for an auto leasing company and took lease payments from people and never delivered the cars. The last federal conviction dealt with the Chrysler financing arm, and now we have this mess. And it is an absolute mess.

Mr. Watkins, deep down you have a scam that you keep running over and over again. And you've previously been sentenced and obviously you didn't learn your lesson because you came back and did it again. And hundreds of letters from people telling you what a swell person you are and how it will be an imposition on your family doesn't offset your behavior.

I recall sitting here during the trial and beginning to get angry because the people you preyed upon were poor and ignorant. And yes, they were—they were too dumb to believe that they could really get cars for nothing. But most of them were preyed upon by your kind of scam to make them think that it's okay. This isn't really a check that's going through, this is just something that helps me get paid. And they'll work out payments with you later. And you don't need to worry about all these things you're signing or even understand them.

And these people signed and they got scammed. Yeah, they got a car for a brief period of time until it was repossessed. But I was trying in my notes to locate the testimony of the one woman who had a job, who didn't understand that you were really going to put her check through, and because she has a job she is being garnished for more than she can afford to pay for a car that she didn't really need because she was too ignorant to understand what was going on.

And those are the kind of people that you brought into the dealership and solicited with finders fees, if you will, to get these folks here.

And then you played the let's scam the finance company. You told people who didn't have a job it didn't matter, to go to open a bank account at a bank that you designated that would give out counter checks starting at 600. And write a check even though there was no money

in the account and send the check through.

And the people told you there's no money in the account, this is a closed account. I don't have any job. And you were playing the game of if we can fool [the check service] too bad for them.

And to some extent, yes, too bad for them. But they expect people who are using their machines to operate with a modicum of good faith and put through checks that they have not been told will bounce for sure. And you did—you did everything to scam everybody.

It's just unconscionable that you keep doing this. And I wonder what kind of sentence is necessary to deter you and to stop it.

Out of appreciation for the fact that you are not a young person and you have some health issues, but nothing terribly significant, and you have a family that will suffer from all of this, I am going to stay within the guideline range. But clearly a sentence at the upper end of the guideline range is called for when you do this over and over again.

And so Mr. Watkins, you are sentenced to 70 months in the custody of the Bureau of Prisons on each of Counts 1 and 2 to run concurrently.

### D.

On January 1, 2010, Watkins' retained counsel filed a notice of appeal, and a motion for leave to file appeal in forma pauperis. Case No. 10–1067 was assigned by the Court of Appeals. This Court required Watkins to submit a financial affidavit, and concluded that he was eligible to appeal in forma pauperis. Watkins' retained trial counsel was appointed as appellate counsel by the Court of Appeals, pursuant to the Criminal Justice Act.

Counsel filed Watkins' brief on May 3, 2010. In the twenty-page brief, counsel

argued that this Court erred in calculating the intended loss and that this Court abused its discretion by failing to sentence Watkins below the guideline range. Counsel argued that the sentence imposed was not reasonable in light of Watkins' childhood and health problems, and due to the challenges that Watkins' wife in raising their minor children in his absence. Counsel noted that Watkins was no longer receiving Social Security benefits due to his incarceration, and that the minor children's Social Security benefits were suspended until Watkins repaid approximately $6,400 to the Social Security Administration. Counsel stated that a sentence "beneath the Guideline range, in light of defendant's age and family circumstances, is adequate in this case to provide deterrence, punish the defendant, and protect the community."

The Government filed a response brief, and Watkins' counsel elected not to file the optional reply brief. Oral argument was held on August 3, 2010.

At oral argument, counsel made a concession regarding the intended loss, concluding that even if the intended loss amount was incorrectly calculated it would not have impacted the guideline range. Counsel made the same arguments regarding a below-guideline sentence that were set out in the brief. Counsel discussed the Social Security issues, and acknowledged upon inquiry from a panel member that some of this Social Security information was not before Judge Scott at the time of sentencing.

Counsel argued that Judge Scott's sentence was unreasonable in light of the mitigation evidence. Counsel conceded that, under Seventh Circuit precedent, a sentence with the guideline range is presumed to be reasonable on appeal, and that the appellant must overcome that presumption. Counsel acknowledged that the families of all defendants are impacted by incarceration, but argued that the health of Watkins' wife's and the age of the minor children warrant a sentence below the guidelines range.

At oral argument, counsel for the Government reminded the panel that Watkins was a recidivist, with previous fraud convictions. Counsel for the Government stated that he was sympathetic to the plight of the Watkins family, but that this was something Watkins should have considered before committing the offense.

The Court of Appeals entered a non-precedential decision on September 1, 2010, affirming the judgment of this Court. *See United States v. Watkins*, 393 Fed. Appx. 392 (7th Cir.2010). The Court of Appeals held as follows:

> At sentencing, and in his sentencing memorandum, Watkins's attorney argued in mitigation that Watkins was raised by an abusive father and had an addiction to money. In addition, his attorney argued that Watkins's imprisonment would be a hardship on his family as his wife was dyslexic, had Bell's palsy, and did not work. Furthermore, his attorney noted that Watkins was 66 years old with high blood pressure, restless leg syndrome, and an anxiety disorder.
>
> In deciding on an appropriate sentence, the district court noted that Watkins had a history of fraud, with both federal and state convictions. The court was especially incensed because Watkins preyed on the vulnerable. But the court acknowledged Watkins's argument that his imprisonment would be hard on his family and noted that Watkins was not young and had health problems. Balancing these considerations, the court concluded that a prison term within the guidelines range of 57 to 71 months, but near the high end, was appropriate.

On appeal Watkins argues that his prison term is unreasonable in light of the mitigating factors he cited at sentencing. (Watkins had also contended that the district court miscalculated the amount of loss from his scheme, but he abandoned that position at oral argument.) Watkins's prison term is presumptively reasonable because it falls within the guidelines range. *See Rita v. United States*, 551 U.S. 338, 347–51, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007); *United States v. Portman*, 599 F.3d 633, 636 (7th Cir.2010). We are presented with no reason to disturb that presumption. The district court acknowledged Watkins's arguments in mitigation, but concluded simply that they did not warrant a lower sentence.

AFFIRMED.

*Id.* at 393–94.

### III.

### A.

On January 21, 2011, Watkins filed his Motion to Vacate, Set Aside, or Correct Sentence in this case.

Watkins claimed that the attorney who represented him at trial, sentencing, and appeal provided ineffective assistance of counsel. Watkins alleged that counsel was ineffective during plea negotiations for encouraging him to go to trial and to reject the offered plea agreement. He further alleges that counsel was ineffective during trial. He alleges that counsel failed to conduct his own investigation before the sentencing hearing, and that he failed "to provide any witnesses, testimony or evidence in mitigation" at the sentencing hearing. Finally, Watkins alleges counsel was provided ineffective assistance on appeal.

Watkins filed a thirty-page Memorandum of Law in support of his Motion. In the Memorandum, Watkins states that while he was represented by the public defender, he began meeting with a private attorney to discuss his case, including showing him the plea agreement. Watkins states that the private attorney told him he should not take the plea agreement, but that he should hire the attorney because he could win the case for Watkins. Watkins states that the attorney told him that a $10,000 retainer was required to obtain his services. Watkins states that the attorney said that $10,000 was needed because he would need to hire an investigator to interview witnesses. Watkins states that the attorney told him the key to the case was to "follow the money."

Watkins states that he spoke with the public defender about his conversation with the private attorney, and that the public defender told Watkins that he would lose at trial and be imprisoned for fifteen years.

Watkins stated the following:

My family and myself came up with the $10,000.00 and [the private attorney] came to my house for the payment and he told us to call the Public Defender and tell him I was going to go to trial.... The Public Defender said we would have to go before the judge and schedule it which we did and the Judge said he would schedule it, and the next day after that [the private attorney] notified the Court he was taking the case....

The attorney represented Watkins at trial, sentencing, and appeal.

Watkins offered a number of critiques regarding retained counsel's cross-examination of witnesses for the prosecution.

Watkins stated that counsel did not ask Watkins about producing mitigation witnesses, that he merely had Watkins solicit character letters to be sent to Judge Scott. Watkins states that he first saw the presentence investigation report on the morn-

ing of the sentencing hearing. Watkins claims that counsel was unprepared for the sentencing hearing. Watkins faults counsel for not having his family members or physicians testify at the sentencing hearing.

Regarding counsel's performance on appeal, Watkins claims that the brief was deficient and that counsel should have followed Watkins' recommendations and critiques of the brief.

Watkins attached the following documents to the Memorandum:

- Watkins' Affidavit—restating same factual allegations contained in the Memorandum;
- Affidavit from Watkins' Wife—reviewing briefly the hiring of the private attorney, and stating that the attorney did not inquire whether she would like to testify at the sentencing hearing;
- Affidavit from Watkins' Brother-corroborating Watkins' account of meeting with retained attorney that took place at Watkins' house;
- Affidavit from Watkins' other Brother—corroborating Watkins' account of meeting at Watkins' house, averring that he fronted most of the money for the retainer, and stating that counsel never approached him to testify at the sentencing hearing;
- Affidavit from Watkins' Sister–in–Law—corroborating Watkins' account of meeting at Watkins' house, and stating that counsel never asked her to testify for Watkins;
- Affidavit from Friend who Testified at Trial—stating that counsel never approached him about testifying for Watkins; [2]
- Affidavit from Friend who Testified at Trial—stating that counsel had very limited contact with him before he testified at trial;
- Copy of Draft Plea Agreement—draft binding plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(A) and (C) that would have resulted in a sentence of 33 months if the parties had agreed to it and if it was accepted by the Court, the draft agreement would have left restitution open;
- Letter from Counsel to Watkins—counters complaints raised by Watkins regarding the appellate brief, includes the following: "[w]e did not present any witnesses at your sentencing because you did not want your family to come to the sentencing;"
- Letter from Watkins to Counsel—Watkins' complaints regarding the appellate brief; and
- Copy of Appellate Brief Prepared by Counsel.

### B.

The Court directed the Government to respond to the Motion. The Government filed its Response on March 15, 2011. In the Response, the Government argues that Watkins demonstrated an unwillingness to plead guilty, and that counsel cannot be faulted for his decision to proceed to trial. The Government pointed to Watkins' affidavit where he was reportedly advised by two assistant federal public defenders that he should take the plea deal. The Government also referred to his letter to Judge Scott wherein he stated that in order to plead guilty he would have to lie to the Court. The Government also referred to an affidavit from Watkins' trial counsel that was attached to the Response.

Regarding the allegations of deficient performance at trial, the Government countered that his performance was not deficient, and in any event, as Watkins

---

**2.** This individual did testify at trial.

concedes, the evidence of his guilt was overwhelming.

Regarding the allegations that counsel was deficient at sentencing, the Government argued that counsel did make mitigation arguments, and that Watkins' assertion that the sentence would have been lower had mitigation witnesses been called was entirely speculative. The Government concluded that Watkins' complaints regarding the counsel's loss argument were without merit, because counsel is under no obligation to raise frivolous arguments.

The Government argued that Watkins failed to make a showing of ineffective assistance of counsel on appeal.

Finally, the Government argued that it is not necessary to hold an evidentiary hearing to resolve this case.

Below is the relevant portion of the affidavit executed by Watkins' counsel, which was attached to the Government's Response:

I represented Max Watkins in his underlying criminal case (08–30070) as well as on appeal.

At no time did I advise Mr. Watkins that "we would win" if I took the case to trial or that he would not go to prison. I did, in fact, advise Mr. Watkins that the case would be difficult to defend as he had made three statements, two to law enforcement and one to the Tele-Check investigator, in which he confessed to the charges and admitted that he knew his conduct was illegal and that those statements would be introduced at trial.

I had numerous conversations with Max Watkins in which I advised him to take the Government's plea offer but on each occasion Watkins refused to plead guilty and adamantly voiced his desire to go to trial. I met with Watkins twice at my office and on at least eight occasions at his residence because he had been placed on home confinement.

In preparation for trial, I reviewed the Government's discovery, which included the reports of interviews of the Government's trial witnesses and the documentation supporting each of the attempted sales transactions. I also spoke by telephone with [four] potential defense witnesses suggested by Watkins, ... [two] of whom testified on behalf of Watkins at trial.

I did not call any of Watkins' family members to testify at his sentencing because Watkins told me he did not want his family present at his sentencing.

I argued in mitigation with respect to Watkins' age, family circumstances, poor health and difficult upbringing, as well as the poor medical condition of his wife, both in Defendant's Sentencing Commentary and at sentencing. I also argued that the amount of loss had been calculated incorrectly, both at sentencing and on appeal.

At no time after his conviction at trial did I advise Watkins that he would receive a sentence of 30 months. In Defendant's Sentencing Memorandum, which I filed with the Court on December 14, 2010, I asked the Court to consider a sentence of 36 months, below the advisory guideline range, based upon the mitigating factors I presented in the Memorandum. I mailed a copy of the Sentencing Memorandum to Watkins.

C.

On April 4, 2011, Watkins submitted a Reply disputing some points made by the Government, providing additional citations to caselaw, and making further argument why an evidentiary hearing was necessary.

On April 6, 2011, Watkins submitted an Addendum to his Motion, which included an attachment—a photocopy of a check containing part of the retainer paid to counsel.

On April 20, 2011, Watkins filed a Traverse, containing a list of "undisputed facts" and restating many of the arguments made in his Motion and Memorandum.

On March 27, 2012, Watkins filed a motion in his criminal case (No. 08–cr–30070) requesting that the Court take notice that the Supreme Court had granted the petitions for writ of certiorari in *Missouri v. Frye*, No. 10–444, and *Lafler v. Cooper*, 10–209. On April 3, 2012, Watkins filed a Motion to Amend in his criminal case, noting that the Supreme Court had issued decisions in *Frye* and *Cooper*.

On April 17, 2012, U.S. District Judge Sue E. Myerscough dismissed Watkins' Motions filed in his criminal case for lack of jurisdiction. Judge Myerscough noted that Watkins already had an open § 2255 case before the undersigned, and construed his filing in the criminal case as a second or successive § 2255 motion.

In May and June of 2012, Watkins and several relatives sent letters to the Court referring to the meeting with counsel at Watkins' house, and the Supreme Court's decisions in *Missouri v. Frye*, —— U.S. ——, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012) and *Lafler v. Cooper*, —— U.S. ——, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012). (The letters from relatives were filed in this case, not his criminal case; Watkins' letter was filed in both cases.)

## IV.

### A.

■■■ In order to establish a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was deficient and that he was prejudiced as a result. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

### B.

■■■ The Court will first address Watkins' primary claim—that but for ineffective assistance of counsel he would have accepted the draft plea agreement for 33 months, instead of going to trial and being sentenced to 70 months.[3]

On March 21, 2012, the Supreme Court issued two opinions that relate to claims of ineffective assistance of counsel in the plea bargaining context—*Missouri v. Frye*, —— U.S. ——, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012) and *Lafler v. Cooper*, —— U.S. ——, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

*Frye* involved a defense attorney who failed to convey to his client information regarding a plea bargain offered by the prosecution. *See Frye*, 132 S.Ct. at 1408. Watkins has never claimed that he was unaware of the plea agreement offer, and as a result, *Frye* does not have a significant, specific impact upon the case at bar.

In *Cooper*, defense counsel allegedly advised his client not to take a plea deal because the prosecution would be unable to prove its case. *See Cooper*, 132 S.Ct. at

---

**3.** The Court notes at the outset that there is no need to hold an evidentiary hearing in this case. The Court is aware that the affidavits of Watkins and his attorney portray differing views of the facts. However, an evidentiary hearing is needed only when a petitioner alleges facts that, if true, would entitle him to relief. *See Bruce v. United States*, 256 F.3d 592, 597 (7th Cir.2001). Here, there is sufficient information before the Court to determine that Watkins is not entitled to relief. *See* 28 U.S.C. § 2255(b).

1383. The Supreme Court stated the following in *Cooper*:

> In some cases, the sole advantage a defendant would have received under the plea is a lesser sentence. This is typically the case when the charges that would have been admitted as part of the plea bargain are the same as the charges the defendant was convicted of after trial. *In this situation the court may conduct an evidentiary hearing to determine whether the defendant has shown a reasonable probability that but for counsel's errors he would have accepted the plea.* If the showing is made, the court may exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between.

*Id.* at 1389 (emphasis added).

In this case, there is no need to hold an evidentiary hearing. The record evidence clearly shows that Watkins was unwilling to plead guilty and accept responsibility for his crimes.[4]

He stated the following in a hand-written letter to Judge Scott: "I have been getting a lot of pressure from [the public defender] to plead guilty and take a deal. To do so I feel I would have to lie to the Court and I do not want to do that."

Watkins said the following to Judge Scott in open court regarding pleading guilty: "If I sign this agreement, I admit that I took this money, which I didn't take this money.... And I just felt that I couldn't stand up and lie to the Court and lie to the Court to say that I did things that they're saying I did.... I do not want to lie. I would be lying.... In my heart I would be lying to the Court."

At the time he made these statements, he was represented by his court-appointed public defender, who had repeatedly counseled him to take the plea deal. The private attorney had not yet been paid the retainer or entered an appearance.

Even if all of Watkins' allegations regarding retained counsel are true, he would be unable to show a "reasonable probability" that he would have accepted the plea deal had he been afforded effective assistance of counsel. His contemporaneous statements to Judge Scott show an absolute unwillingness to accept the plea agreement offered by the prosecutor.

### C.

 Watkins' claims regarding counsel's performance at trial are without merit. The Court has painstakingly reviewed the 739 pages of trial transcripts, and has been unable to find any evidence to support Watkins' claims that counsel was ineffective. In fact, considering the hand he was dealt, counsel did an admirable job of holding the Government to its evidence and trying to cast doubt on the case against Watkins. Counsel appeared prepared, and made appropriate objections, most of which were sustained by Judge Scott. Counsel's cross-examination was on-point and focused.

The Court notes that the opening and closing arguments were reported, but not transcribed. However, it was apparent from counsel's cross-examination that he was trying to emphasize several themes throughout the trial—that the check services provided inadequate training, that the use of birddog or finder's fees created incentives for individuals to refer friends with poor credit to Watkins, and that the management of the dealership may have

---

4. The Court notes that, under *Cooper*, even if ineffective assistance of counsel is proven, the Court should consider, in fashioning a reme-

dy, a defendant's willingness to accept responsibility. *Cooper*, 132 S.Ct. at 1389.

either played a greater role in the offense or at least turned a blind eye to the conduct because Watkins was selling a large number of cars.

■ The Court notes that most of Watkins' criticisms relate to strategic decisions, such as whether to cross-examine a specific witness. Courts typically defer to counsel regarding trial strategy. *See United States v. Hirschberg*, 988 F.2d 1509, 1513 (7th Cir.1993).

Even if counsel was ineffective at trial, Watkins would not be entitled to relief, because, as he admits in his Memorandum, the evidence of his guilt was overwhelming.

### D.

■ Watkins' arguments regarding counsel's performance at sentencing are without merit. Counsel effectively made numerous mitigation arguments that relied upon facts corroborated by the PSR. Counsel cited 18 U.S.C. § 3553(a), and invoked the "parsimony provision" of that subsection. Counsel arranged for character letters to be sent to Judge Scott. Given Watkins' extensive history of committing financial fraud and the scope of his fraud in the case, counsel did an admirable job of advocating for his client, and the Court concludes that his performance was not ineffective.

■ Even if counsel's performance was ineffective, the Court concludes that Watkins is not entitled to relief, because the result would have been the same. Watkins' primary criticism of counsel is that counsel did not have Watkins' relatives testify at the hearing. However, Judge Scott clearly stated that more mitigation evidence would not have mattered, because Watkins' recidivism and the nature of the offense led her to conclude that a harsh sentence was necessary in this case:

> Mr. Watkins, deep down you have a scam that you keep running over and over again. And you've previously been sentenced and obviously you didn't learn your lesson because you came back and did it again. *And hundreds of letters from people telling you what a swell person you are and how it will be an imposition on your family doesn't offset your behavior.*

Watkins' arguments regarding the loss amount are without merit.

### E.

■ Watkins' claims regarding counsel's performance on appeal are, likewise, without merit. Counsel had an uphill battle— trying to get the Court of Appeals to overturn the within-guidelines sentence of a recidivist.

The Court has reviewed the appellate brief and listened to the audio recording of the oral argument. Counsel raised the only issues available on appeal. The Court concludes that, given the record below, counsel did an adequate job of representing Watkins in the Court of Appeals.

### V.

■ "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing Section 2255 Proceedings. "A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner makes a substantial showing where reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Sandoval v. United States*, 574 F.3d 847, 852 (7th Cir.2009) (quotation marks omitted).

Watkins' Motion is without merit. Reasonable jurists would not dispute this. Accordingly, the Court will not issue a certificate of appealability. If Watkins wishes to appeal this Court's ruling, he must seek a certificate of appealability from the Court of Appeals under Federal Rule of Appellate Procedure 22.

## VI.

*Ergo*, Petitioner Max Wayne Watkins' Motion to Vacate, Set Aside or Correct Sentence is DENIED.

The Court declines to issue a certificate of appealability.

IT IS SO ORDERED.